THE MISSOURI PACIFIC RAILWAY COMPANY V.
CATHERINE A. HOLCOMB.

1. PASSENGERS *on Freight Train — Care by Company.* A railroad company that for years has been in the habit of carrying passengers on one of its local freight trains, is required to exercise the highest possible degree of care and diligence to which such trains are susceptible.

2. CABOOSE — *Degree of Care Increased.* When the caboose which is usually attached to such a freight train is in the repair shop, and a common box-car with temporary rude seats is substituted to accommodate passengers, and the use of such box-car is more dangerous, the degree of care on the part of the company is thereby increased.

*Error from Miami District Court.*

ACTION to recover damages for bodily injuries. The facts are fully stated in the opinion. Verdict for the plaintiff *Holcomb,* at the February term, 1888, for $5,000 damages. New trial denied, and judgment given for the plaintiff. The defendant *Company* comes to this court.

*W. A. Johnson,* for plaintiff in error.

*W. R. Wagstaff,* and *Jno. C. Sheridan,* for defendant in error.

Opinion by SIMPSON, C.: Catherine A. Holcomb brought her action against the Missouri Pacific Railway Company to recover damages for personal injuries occasioned, as she alleges, by the negligent, careless and unskillful management of the train upon which she was a passenger. These personal injuries consisted in a fracture of the upper part of the thigh bone, and other serious wounds, caused by the sudden and violent jerking of the car in which she was riding as it started from the station, throwing her with great violence out of her seat and upon the floor, thus producing the injuries complained of. Mrs. Holcomb was a widow, with a family of six children, and at the time of the injury was fifty-five years old, possessing an unusually strong and vigorous constitution,

had not been sick for more than five years, was doing, and for years had been doing, all her own household work and washing without assistance. From the time of the injury up until about the 4th day of July, 1887, she was compelled to and did remain night and day propped up in an easy-chair. After that date she became able to lie a part of the time on a couch, and then she improved so that she could go about the house on crutches, but not able to ascend stairs, and she remains permanently crippled and unable to do any work, except such as she can do sitting in a chair. At the time of the last trial she had decreased in weight about fifty pounds.

The train upon which Mrs. Holcomb received the injury complained of consisted of thirty-six freight cars, twenty-seven empties and nine loaded. It was known as a local freight, scheduled to carry passengers, and had been running at about the same time for several years, carrying passengers. This train usually left Paola, going east, at 1:40 P. M., but on this day (December 10, 1886) it was about two hours behind the regular time. It usually carried more passengers from two stations east of Paola, to and from that point, than the regular passenger train, as the time of its arrival and departure to and from Paola was more convenient to the people living in the eastern part of the county, than the regular passenger train. She purchased a ticket from the company's agent at Paola for passage on the train on which she received the injury, paying the regular price charged on all trains between that station and the station of Louisburg, where she was going. Other passengers going to the two stations east of Paola also bought tickets from the company's agent for passage on this particular train. The regular caboose usually attached to this train was in the repair shop, and an ordinary box-car, fitted with two rough pine seats, covered with caboose cushions, was being used in its place. She went aboard the train at Paola, and took a seat in the box-car at the southeast side of the car, two or three feet from the sliding door on the side. The train ran to Somerset, the first station east of Paola, a distance of six or seven miles. When the train started at

Somerset it did so with a violent jerk, that threw Mrs. Holcomb on the floor of the car near the center, and inflicted the injuries complained of. She was picked up by one of the crew and a passenger and placed in a chair, and when the train stopped at Louisburg was carried in a chair to a carriage, and taken to her home. At the time the train started at Somerset with the "violent jerk" which threw Mrs. Holcomb out of her seat, a brakeman in the car was braced against the side of the car; Reid, a passenger, was holding on to the door with both hands; Huddleson, a passenger, was holding on to an iron hand-hold by the side of the door; and Mathers, a passenger, had a hold on the side of the ladder. These persons all testified at the trial, explaining how they were protected from injury by the movement of the train as it started from Somerset. The case was twice tried by a jury, the first trial resulting in a verdict for $4,643.74; this being set aside, the court sustained a motion for a new trial, and this trial resulted in a verdict for $5,000 in favor of Mrs. Holcomb. The following special findings were returned by the jury:

"1. Did the plaintiff on December 10, 1886, at Paola, Miami county, Kansas, get in the rear car of defendant's train No. 138, commonly known as the 'local freight'? *Ans.:* Yes.

"2. Did the defendant's ticket and station agent at Paola, Kansas, tell the plaintiff on the arrival of said train, 'This is your train,' or words to that effect? A. Yes.

"3. Was said train at that time, and had it been for a number of years prior thereto, used for the conveyance of freight and passengers over the defendant's line of railroad to and from Paola and Louisburg, in Miami county, Kansas, and other points on its said line? A. Yes.

"4. Did ladies, as well as others, frequently ride upon said train? A. Yes.

"5. Was the rear car of said train the only one used for conveying passengers? A. Yes.

"6. Did the defendant's brakeman assist the plaintiff to enter said rear car of said train at Paola, Kansas, on December 10, 1886? A. Yes.

"7. Was the car the plaintiff so entered an ordinary box-car with a long seat constructed on and along the wall on each

side of which seats were covered with cushions, and which car was then being used instead of the usual caboose run on the rear end of said train? A. Yes.

"8. Was said car plaintiff entered, as aforesaid, used on said train for about two weeks in lieu of the said caboose car to carry passengers, and did passengers with the consent of defendant ride in it during said time it was so used? A. Yes.

"8½. Did the conductor of said train before arriving at Somerset take up a ticket plaintiff had purchased at the regular price of forty cents from defendant's ticket and station agent at Paola, Kansas, for passage from Paola to Louisburg, in Miami county, Kansas? A. Yes.

"9. How many of the passengers were aboard of said car when plaintiff's ticket was taken up by the conductor? A. Five or six.

"10. While in said car on said 10th day of December, 1886, on the way to Louisburg, without any fault on her part, was she injured by the negligence of defendant's agents, or either of them, operating said train? A. Yes.

"11. How many other passengers were on or in said car at the time the plaintiff was injured? A. Two or three.

"12. At the time plaintiff sustained the injury, was she sitting properly and securely on the seat provided for passengers in the rear car of said train? A. Yes.

"13. Was the plaintiff thrown violently from the seat she was sitting upon, her side upon the floor of said car by the sudden, violent, unnecessary and negligent jerking of said train in starting the same at Somerset? A. Yes.

"14. Was the injury plaintiff sustained on said train at Somerset directly caused by negligence of the defendant's agents, or either of them, in operating or managing said train, and without any negligence on the part of the plaintiff? A. Yes.

"14½. By reason of the plaintiff being violently thrown from her seat in said car to the floor by the negligence of the defendant in violently and negligently jerking said car in starting said train, was she seriously and permanently injured, and was the upper part of her thigh bone fractured, and other parts of her body bruised and injured? A. Yes, to injury; but uncertain as to fracture.

"15. Was the plaintiff, by reason of being thrown to the floor by the negligent and violent starting of the train, rendered unconscious? A. Yes.

"16. How far was plaintiff thrown from her seat by the sudden and violent starting of the train? A. Two or three feet.

"17. Could the engineer, by the exercise of reasonable care and prudence, have avoided the violent jerk of the car that threw the plaintiff from her seat to the floor? A. Yes.

"18. Was the engineer careless in starting the train at the time the plaintiff was thrown from her seat? A. Yes.

"19. Was the train on which plaintiff was injured authorized to carry passengers? A. Yes.

"20. By reason of the plaintiff being thrown from her said seat in said train at Somerset, by the negligent and violent starting of the train, did she sustain injuries which have permanently crippled and disabled her? A. Yes.

"21. Was the health and constitution of the plaintiff at the time of injury unusually good and vigorous for one of her age, and up to that time had she been able and did she perform the work of her household, consisting of washing, ironing, cooking, sewing, etc., for a family of four to seven persons? A. Yes.

"22. Since said injury has she declined very much in flesh, and been unable to work or care for herself without assistance, and is she still in that condition? A. Yes.

"23. By reason of said injury has plaintiff suffered great pain and loss of previous good-health? A. Yes.

"24. Does the plaintiff still suffer pain resulting from said injury? A. Yes."

The following questions were asked by the railroad company, and answered as follows:

"1. Did the plaintiff go upon one of defendant's freight trains at Paola to be carried upon said train to Louisburg? *Ans.:* Yes.

"2. Was plaintiff riding on one of defendant's freight trains at the time she received the injuries complained of in this action? A. Yes.

"3. When plaintiff went aboard of defendant's train at Paola, on the 10th day of December, 1886, did she get into a box-car provided with a temporary seat for the use of the train-men that were engaged in running the freight train? A. Yes; and also used for passengers.

"4. Was there any passenger car or caboose in the train that plaintiff took passage upon at Paola for the purpose of riding to Louisburg? A. Yes; an improvised caboose.

"5. Had the train that plaintiff took passage in at Paola for the purpose of riding to Louisburg, any car intended solely for the carriage of passengers? A. No.

" 6. If the jury answer the last question in the affirmative, they will please state what kind of a car it was? A. ——.

"7. Was the plaintiff sitting near the end of the seat constructed of boards that had no guards to prevent her from slipping off in case of a sudden jerk of the car? A. Yes; from one to two feet from end of seat.

" 8. When the train started up at Somerset, did it start up with a jerk; [answer inserted here, " Yes;"] and did plaintiff slip off the end of the seat and fall on the floor of the car and strike the floor with the back part of her thigh? A. No; thrown off.

" 9. Was the injury received by the plaintiff caused by reason of the failure of the defendant to provide a safe car for the carriage of passengers? A. No.

"10. Was the failure of the railway company to provide a safe car furnished with convenient and well-arranged seats the cause of the injury to plaintiff? A. No.

"11. Did the plaintiff make any effort to save herself from falling off the seat when she heard the rattle of the cars in pulling out the slack? A. Yes.

"12. If the jury answer the last question in the affirmative, they will state what effort was made? A. By bracing with her hands.

"13. How far was plaintiff lying on the floor from the seat on which she had been sitting? A. Two to three feet.

"14. In what direction was plaintiff lying on the floor from the seat where she had been sitting? A. Northwest."

The first error complained of was the refusal of the trial court to give the following instruction:

"If the jury find from the evidence that the train upon which the plaintiff was riding at the time she received the injury complained of was simply a freight train, and had no passenger coach or caboose for the carriage of passengers; that it was simply provided with a box-car with improvised seats and benches for the accommodation of the men connected with the train; that they slept in it, and deposited the lamps of the cars and tools that they used in it, and it was not adapted for passengers; and the plaintiff entered the car with the full knowledge of these facts, and paid fare to be

carried on said train—the same being only used or intended for the carrying of freight—then in the carriage of plaintiff the defendant was simply a private carrier for hire, and as such carrier, being only a freight train, it was not under the same obligation and responsibility which attaches to common carriers of passengers by rail.    The latter undertakes for hire to carry all passengers indifferently who apply for passage; and the law for the protection of travelers subjects such carriers to very strict responsibilities.    The defendant in this case would not be subject to the stringent obligations and responsibilities of a common carrier of passengers if it did not hold out itself as capable of carrying passengers safely, and had no arrangement of this train for passenger service.    It was not required to provide its freight trains with the necessary means of carrying passengers.    If the plaintiff knew its condition, and the relation to her when she applied for passage, she therefore took upon herself the risk incident to the mode of conveyance used by defendant.    Under these circumstances the defendant was only required to exercise such care and skill in the management and use of the train as prudent and cautious men experienced in such business are accustomed to under similar circumstances."

This instruction totally ignores the fact that this train had for some years been carrying passengers; that the railroad company had sold this passenger a ticket that entitled her to ride on this train; that it was the bounden duty of the company to furnish the passengers a reasonably well equipped car to ride in, and that if by an accident the regular caboose usually provided for passengers could not be used, and the improvised box-car used on that occasion was more dangerous to the passenger than the caboose, that the degree of care on the part of the company was thereby increased.    It cannot be the law that a railroad company furnishing inferior accommodations to its passengers is protected from liability on account of the inferiority.    It is the law of this country, as we understand it, that a passenger riding on a freight train is entitled to demand from the railroad company transporting him the exercise of the highest possible degree of care and diligence to which such trains are susceptible. (*Topeka City*

2. Caboose—degree of care increased.

1. Passengers on freight trains—care by company.

*Rly. Co. v. Higgs*, 38 Kas. 375.) The supreme court of the United States in the case of *I. & St. L. Rld. Co. v. Horst*, 93 U. S. 291, say (p. 295, commencing with the last paragraph on the page):

"Such is the rule of care and diligence laid down by this court in three adjudications where the action was against a carrier of persons. The first was the *P. & R. Rld. Co. v. Derby*, 14 How. 486. The plaintiff was traveling gratuitously on a passenger train. It was said, 'Where carriers undertake to convey passengers by the powerful and dangerous agency of steam, public policy and safety require that they should be held to the greatest possible care and diligence.' 'Any negligence in such case may well deserve the epithet of 'gross.'' " The next was *The New World v. King*, 16 How. 469. That was the case of a free passenger carried on a steamer, and injured by the explosion of a boiler. Referring to the rule laid down in the prior case, the court said: 'We desire to reaffirm the doctrine, not only as resting upon public policy, but on sound principles of law.' The last case was the *N. Y. C. Rld. Co. v. Lock*, 17 Wall. 357. That was a case like this, of a passenger accompanying his cattle on a freight train. It was there said: 'The highest degree of carefulness and diligence is expressly exacted.' This is conclusive as authority upon the subject. But, upon principle, why should not the law be so in this case? Life and limb are as valuable, and there is the same right to safety in the caboose as in the palace car. The same formidable power gives the traction in both cases. The rule is uniformly applied to passenger trains. The same considerations apply to freight trains; the same dangers are common to both. Such care and diligence are as effectual and as important upon the latter as upon the former, and not more difficult to exercise. There is no reason in the nature of things, why the passenger should not be as safe upon one as the other. With proper vigilance on the part of the carrier, he is so. The passenger has no authority upon either, except as to the personal care of himself. The conductor is the animating and controlling spirit of the mechanism employed. The public have no choice but to use it. The standard of duty should be according to the consequences that may ensue from carelessness. The rule of law has its foundation deep in public policy. It is approved by experience, and sanctioned by the plainest principles of reason and justice. It is of great importance that courts of justice should not re-

lax it. The terms in question do not mean all the care and diligence the human mind can conceive of, nor such as will render the transportation free from any possible peril, nor such as would drive the carrier from his business. It does not, for instance, require with respect to either passenger or freight trains, steel rails and iron or granite cross-ties, because such ties are less liable to decay, and hence safer than those of wood; nor upon freight trains air-brakes, bell-pulls, and a brakesman upon every car; but it does emphatically require everything necessary to the security of the passenger upon either, and reasonably consistent with the business of the carrier, and the means of conveyance employed. The language used cannot mislead. It well expresses the rigorous requirement of the law, and ought not to be departed from. The rule is beneficial to both parties. It tends to give protection to the traveler, and warns the carrier against the consequences of delinquency. A lower degree of vigilance than that required would have averted the catastrophe from which this litigation has arisen."

A fair application of this rule would reach this case even if the facts were that Mrs. Holcomb was riding on a train that was used exclusively for freight, if the agent of the company had taken her money and given her a seat in a freight car. But we are dealing with a state of facts here where it appears that this local freight was advertised to carry passengers, and had been doing so for years. The instruction refused, therefore, ignored the facts, and misstated the law. Every instruction asked for by the railroad company about which it now complains, ignores the fact that this train was advertised to and did carry passengers. It is doubtful whether they are good as applied to a freight train that was not in the habit of carrying passengers, but they are certainly not good as applied to this train. A railroad company cannot for years carry passengers on one of its freight trains, and then escape liability for injuries occasioned by negligence or reckless management by denying that the ordinary rules governing common carriers for hire do not apply to its trains of this character. There were no errors committed by the trial court in refusing the instructions asked for by the railroad company.

The general charge of the court was unusually liberal to the company in a case of this character. Take these selections from the instructions, and it will be seen that there was no prejudice against the company:

"The company may permit passengers to ride upon its freight trains, and when a person elects to ride as a passenger on a freight train, such passenger assumes all the dangers and discomforts ordinarily and necessarily incident to such mode of travel."

"The plaintiff cannot recover for the failure of the company to provide a suitable car."

It is asserted that the jury answered the second question submitted by the plaintiff below directly contrary to the evidence, but we find in the record that Reid, a passenger on the train, testified that he saw the agent point out the train to Mrs. Holcomb, and say to her, "This is your train." The "violent jerk" was the proximate cause of the injuries to Mrs. Holcomb, causing her to be thrown from the seat onto the floor. The locomotive engineer of the train was a witness on behalf of the railroad company, and testified at the trial "that he could have moved the train so slow that you would scarcely see it moving." This is a complete answer to the claim of the company that the injuries were the result of unavoidable accident, and explodes the theory that the starting of a freight train is necessarily accompanied with a series of violent jerks occasioned by "taking out the slack." The conduct of the engineer and those in charge of the train was not only reckless and grossly negligent in the management of the train, but they were also unmindful of the ordinary promptings of human nature to try in some way to alleviate the physical sufferings of a human being.

The verdict and judgment are right, abstractly and judicially; and we recommend an affirmance.

By the Court: It is so ordered.

All the Justices concurring.