## ST. LOUIS & S. F. R. CO. v. LONG.

No. 2696.   Opinion Filed December 23, 1913.

(137 Pac. 1156.)

1.   PLEADING — Amendment—Discretion—Death of Railroad Employee. Where allowance of filing of amended petition immediately before trial and of insertion of additional allegation amending feature in description of accident resulting in death for which damages are claimed to conform to facts proved do not change substantially plaintiff's claim, and it does not appear any right of defendant was thereby prejudiced, it was in the sound discretion of the court to permit same.

2.   CONTINUANCE — Grounds — Surprise—Discretion. Where attorney for plaintiff, in questioning jurors as to causes for challenge, makes statement erroneously construed as disclosing ground for removal of case to federal court in conflict with allegation in petition, whereupon attorney for defendant claims surprise, asks leave to withdraw announcement of ready for trial and answer on file and for continuance of case for purpose of time in which to file petition and bond for such removal, whereupon attorney for plaintiff disclaims intent to state and expressly denies existence of such ground, and the undisputed evidence showed that no such ground existed, there was no error in denying such leave and continuance.

3.   **TRIAL—Reopening Case—Discretion.** Where, after both parties have rested, plaintiff is permitted, over oral objection and statement by defendant that she had already announced that her case was closed (which record does not show), that defendant's witnesses have been excused and have left town (which is denied by plaintiff and not supported by affidavit or other proof), and that amendment allowed did not conform to the proof already introduced (which is not entirely correct), to introduce evidence relating to whether space in which her decedent's foot was caught should have been blocked by defendant, and where no prejudice of right or abuse of discretion in doing so appears, there is not reversible error.

4.   **APPEAL AND ERROR — Harmless Error — Evidence—Diagram.** The unnecessary permitting of diagram on floor in view of jury and its use, by reference thereto, in questions to and answers by witnesses, is, at least, not to be commended; but, where only few questions and answers relate thereto, and the court then expresses disapproval, to which deference is shown by desisting from such references, and the party objecting thereafter causes witness to make and puts into record a diagram like the one on the floor, and also later puts into record a more elaborate diagram including the same features as the one on the floor, the error will not require reversal of the case.

5.   **NEGLIGENCE — Contributory Negligence — Question for Jury.** Const. art. 23, sec. 6 (section 355, Williams' Ann. Const.), of Oklahoma, is not merely declaratory of the common law, but requires that the defense of contributory negligence and of assumption of risk, as questions of fact, in all cases whatsoever, shall, at all times, be left to the jury; and the finding of the jury upon these defenses is conclusive upon the courts.

6.   **TRIAL—Contributory Negligence—Refusal of Instructions.** It is not error to refuse requested instructions going beyond bare definition, as to the defenses of contributory negligence or assumption of risk, though they correctly state the law in other respects, if the jury are not instructed and the party presenting same does not request instruction to effect that "the defense of contributory negligence or of assumption of risk, in all cases whatsoever, shall be a question of fact, and shall, at all times, be left to the jury."

7.   **SAME—Refusal of Instructions Covered—Negligence—"Ordinary Care" — "Ordinary Negligence" — "Contributory Negligence."** Where the court defines "ordinary care" as "such care as a person of ordinary prudence would exercise about his own affairs of ordinary importance" and the want of same as "ordinary negligence," and further instructs that "contributory negligence, as used in these instructions, is such an act or omission on the part of plaintiff's decedent which amounts to a want of ordinary care on his part and which, concurring or co-operating with the negligent act of the defendant, is the proximate cause or occasion of the act complained of," it is not reversible error for the court to refuse to give a differently worded instruction substantially to the same effect, nor another that merely emphasizes and illustrates the rule given the jury.

8. **SAME—Injury to Railroad Employee—Refusal of Instruction—Evidence.** Where uncontradicted evidence shows safety would result from blocking dangerous open space between guard rail and main line rail in yard of railroad company used in switching cars at night, and that, besides defendant, which did not, two of three other roads for which the only witness on this point had worked used the blocking system, which it does not appear introduces any new danger, it was not error to refuse to instruct "that the mere fact that defendant did not block the frogs, guard rails, and angles between the side track and the rail of its main track will not warrant you in finding that the defendant was negligent, and such omission on the part of the defendant does not amount to negligence as a matter of law."

9. **DEATH—Damages Recoverable.** Where plaintiff wife was nearly 24 years old, the child for whom she also sued was two years old, and her decedent husband was 30 years old, sober and healthy, and where decedent had earned as high as $160 per month while working for another railroad company, and, within the 20 or 21 months during which he worked for defendant, had commenced work at $50 and thereafter got $120 per month until about fifteen days before his death, but during these days worked about an hour less time each day and got a little less salary, and where he was affectionate to his family and usually turned his earnings over to plaintiff, who paid bills and deposited balance in bank, and he did not spend money foolishly, although only about $200 was in bank at time of his death and plaintiff's account of his use of his earnings is not entirely satisfactory, it cannot be said a verdict for $15,000 damages by reason of his death from negligence of defendant is excessive and apparently given because of passion or prejudice.

10. **MASTER AND SERVANT—"Assumption of Risk."** "Assumption of risk" is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk.

(Syllabus by Thacker, C.)

*Error from District Court, Marshall County;*
*James R. Armstrong, Judge.*

Action by Mabel V. Long against the St. Louis & San Francisco Railroad Company, a corporation. Judgment for plaintiff, and defendant brings error. Affirmed.

*W. F. Evans, R. A. Kleinschmidt,* and *J. H. Grant,* for plaintiff in error.

*Wolfe, Wood & Haven* and *Hardy & Franklin,* for defendant in error.

Opinion by THACKER, C. In this opinion plaintiff in error will be designated as defendant and defendant in error as plaintiff, in accord with their respective titles in the trial court.

On March 15, 1909, S. H. Long, foreman of defendant's switch engine crew, was killed in uncoupling its moving cars in its yards at Francis, Okla.; and on June 10, 1909, plaintiff, for herself and minor child, Hazel Long, these being wife and child respectively of said S. H. Long, commenced this action against defendant for $35,000 as alleged damages suffered by reason of alleged negligence of defendant, as master, causing the death of the husband and father, as its servant.

The defendant assigns error in that the court permitted plaintiff (first specification) "to file an amended petition after the case had been called for trial" (seventh specification) "to reopen her case after she had announced that she rested," and (eighth specification) "to amend her petition after both the plaintiff in error and defendant in error had rested and after the court had excused the witnesses."

On the same day, but apparently before the case was called for trial, plaintiff was permitted to file, over objection in most general terms, an amended petition alleging negligence in the failure and refusal of the engineer in charge of the switch engine to slow up and stop in obedience to a signal given by plaintiff's decedent before he went between the cars, in anticipation that such signal would be obeyed, to make the uncoupling, and in thereafter starting "said cars backward at a very dangerous rate of speed," which allegations in respect to signal finds no support in the evidence, unless such an inference could have been drawn by the jury from the proven facts admissible under the original as well as the amended petition, which, without necessity for deciding, we may assume for the purpose of this opinion could not have been done; and, although the two other grounds of negligence charged in the original petition were repeated in somewhat changed form in this amended petition, it does not appear that any other material change in the original petition was made by this amendment. Plaintiff's original petition, as well as this amended petition, alleges negligence against the defend-

ant in that it had permitted the frogs and angles of its rails to remain open without blocks, and had permitted the defective condition of the coupling equipment in the car her decedent was attempting to uncouple at the time of the accident; and that from these causes "his foot caught in a frog in the track, or in an angle formed by the side track rail approaching the rail of the main line, and was thrown down and run over by said cars and cruelly killed." After this amended petition was filed, defendant refiled its amended answer, plaintiff filed her reply, and the case went to trial with both parties apparently ready.

After a demurrer to the evidence introduced by plaintiff had been overruled, she asked and was granted permission to withdraw her announcement of rest, defendant thereupon excepted, plaintiff thereupon stated a desire to prove that other railroads in the vicinity of the accident protected users of their yards by blocking frogs as the purpose for which she desired to withdraw such announcement, the defendant then objected, and the court then repeated the permission already given; but the plaintiff thereupon announced: "Well, we will stand on the record as it is."

After both parties had rested in the taking of evidence, plaintiff asked and was permitted to reopen the case and amend her petition to conform to the proof by inserting the following additional words: "That deceased caught his foot between the guard rail and the main line and was thereby run over and killed."

It does not appear wherein the allegation of negligence in the conduct of the engineer in charge of the switch engine in disregarding any signal found defendant unprepared to meet it, even if there had been evidence in support of that allegation, nor wherein the defendant might have been better prepared at any future time, nor wherein the allowance of the amendment made any occasion for the imposition of any onerous term as a condition thereof, nor wherein the amendment by insertion of the words last above quoted is subject to any objection urged against it by defendant; the objection being in general and not specific terms, and the trial being free from any developments showing any wrong done defendant in this regard. Neither of

the amendments changed substantially the claim of the plaintiff, it does not apepar that they operated to the prejudice of the rights of the defendant, and it was in the sound discretion of the trial court to permit each of them.

We are unable to find any reversible error in the action of the trial court complained of in either or all of the three assignments of error above mentioned. Comp. Laws 1909, sec. 5676 (Rev. Laws 1910, sec. 4790) ; *City of Shawnee et al. v. Slankard,* 29 Okla. 133, 116 Pac. 803 ; *Herron v. M. Rumley,* 29 Okla. 317, 116 Pac. 952 ; *Z. G. Fort Produce Co. v. Southwestern Grain & Produce Co.,* 26 Okla. 13, 108 Pac. 386 ; *Lookabaugh v. Bowmaker,* 21 Okla. 489, 96 Pac. 651 ; Comp. Laws 1909, secs. 5673, 5674 and 5675 (Rev. Laws 1910, secs. 4784-4786) ; *Binion v. Lyle,* 28 Okla. 430, 114 Pac. 618 ; *St. L., I. M. & S. Ry. v. Hardwick et al.,* 28 Okla. 577, 115 Pac. 471 ; *Chas. T. Derr Const. Co. v. Gelruth,* 29 Okla. 538, 120 Pac. 253 ; *Coley v. Johnson,* 32 Okla. 102, 121 Pac. 271 ; *Merchants' & Planters' Ins. Co. v. Crane,* 36 Okla. 160, 128 Pac. 260 ; *Gross Const. Co. v. Hales,* 37 Okla. 131, 129 Pac. 28 ; *Booker Tobacco Co. v. Waller,* 38· Okla. 47, 131 Pac. 537.

The defendant further assigns error in that the court refused (specification 2) "to grant the defendant a continuance and" leave "to withdraw its amended answer, which had been filed under a misapprehension of facts, and for the further reason that counsel had overlooked new issues that had been raised in defendant in error's amended petition which plaintiff in error was not prepared to meet."

It does not appear that any new issue other than above stated was raised by any amendment of plaintiff's petition; and this assignment of error appears to be entirely without merit, inasmuch as no "misapprehension of facts" of which defendant could complain is specified in the briefs or appears in the record; it does not appear wherein defendant was surprised or unprepared, or how it might by a continuance have been better prepared to meet any new issue raised; nor is there any specification of new issue overlooked or sufficient explanation given throwing any light upon why counsel overlooked the same. It appears that request

for leave to withdraw the answer from the files was merely an incident of defendant's request for a continuance, and had for its purpose ·the same purpose for which the continuance was asked, *i. e.*, to give defendant time to prepare and file a petition and bond for removal of the case to the proper federal court, and this assignment of error appears to relate to no other purpose whatever; but the record does not disclose any fact justifying such purpose. No further ground for such removal appears, although, in the examination of the jurors as to their qualifications, counsel for the plaintiff stated that she "is at the present time at Stringtown, Okla.;" and thereupon defendant's counsel asked leave to withdraw its announcement of ready for trial on the . ground that the pleadings (evidently referring to said amended petition) and statement (evidently referring to the statement just quoted) of counsel for the plaintiff had taken counsel for defendant· by surprise, in that it appeared to him in the light of that statement that plaintiff was at that time a resident of Oklahoma, which, if true, might have afforded ground for such removal. On this ground, and for the purpose of filing a petition and bond for removal from the state to the federal court, counsel for the defendant asked a continuance of the case. Counsel for the plaintiff (erroneously, as it appears, assuming he had stated she was a resident of Oklahoma) thereupon stated that his statement that plaintiff resided at Stringtown, Okla., was inadvertent; that he did not intend to change her place of residence; and that he meant to state she was visiting her brother at Stringtown, and that he withdrew his former statement. The court stated that, if it should develop that plaintiff was a resident of Oklahoma, the verdict should be set aside. Thereupon defendant added to its motion by asking leave to withdraw its amended answer for the reason that the same was filed under the misapprehension that plaintiff was a resident of the state of Texas. Whereupon the court stated that if it should develop on the trial that plaintiff was really a resident of Oklahoma, defendant should have the right to file a petition for removal; but that, as counsel for plaintiff had declared his remark in this regard was inadvertent, and that he only intended to state she

was visiting in Oklahoma, and there was no evidence before the court as to her residence, defendant's motion would at that time be denied, to which defendant excepted. The uncontradicted evidence of the plaintiff was that she resided (as alleged in both original and amended petitions) in the state of Texas and owned her home at Denison, Tex., and had so resided all her life, except from about February 17, 1908, until some time in March, 1909, during which excepted time she lived at Francis, Okla.; and the request for continuance was not renewed.

"The granting or refusing of a continuance is within the sound judicial discretion of the trial court; and, unless it appears that there was an abuse of such discretion, the order of the trial court in such matters will not be disturbed by the Supreme Court on appeal." (*Kelley et al. v. Wood*, 32 Okla. 104, 120 Pac. 1110, and cases there cited.)

"Surprise at the trial is not sufficient ground for a continuance, unless the surprise is such as cannot be obviated by the exercise of ordinary care and due diligence on the part of the party asking for the continuance." (*M., K. & T. Ry. Co. v. Horton*, 28 Okla. 815, 119 Pac. 233.)

Defendant further assigns error in that the court permitted plaintiff (ninth specification) "to reopen her case and introduce further evidence after same had been closed and after the court had excused the witnesses." Plaintiff asked and was granted leave to reopen the case for the purpose of "offering additional proof" in connection with her last aforesaid application to amend her petition after both parties had rested; and defendant objected to the same as follows:

"To which application of the plaintiff defendant objects for the reason that the plaintiff has already announced that her case was closed and some of the defendant's witnesses have been excused and have left town, and for the further reason that said amendment does not conform to the proof already introduced, and the purpose of the same is to introduce new evidence changing the issues and making the issues other than that raised by the original pleading."

But it does not appear that plaintiff consented nor who excused these witnesses. Plaintiff stated in answer to this objection that no train or witness had left and no witness had any way

to leave, to which defendant did not reply; and no proof was offered upon the issue thus made by statement of counsel. The amendment of the petition was made, as hereinbefore stated, and immediately after this plaintiff recalled the witness Martin J. De Long, and, without further objection, introduced additional testimony relating to the blocking of frogs and angles by railroad companies. The case of *Harris v. Palmer,* 25 Okla. 770, 108 Pac. 385, is in point here. In the opinion in that case the case of *West v. Cameron,* 39 Kan. 736, 18 Pac. 894, is quoted with apparent approval as follows:

"In the case of *West v. Cameron,* supra, the Supreme Court of Kansas on this proposition said: 'The opening of a case for the purpose of receiving further evidence, after the case has been tried, but before any decision has been rendered therein, and the continuance of the case for such evidence, and the receiving of the same are all within the judicial discretion of the court. *     *     *' "

In the state of the record above disclosed it does not appear that there was either prejudice or abuse of discretion in the action of the court in permitting the reopening of the case and the introduction of this additional testimony without objection other than above stated.

The defendant further assigns error in that the court permitted (tenth specification) "incompetent, irrelevant, and immaterial testimony offered by defendant in error and objected to by plaintiff in error," and excluded (eleventh specification) "competent and relevant testimony offered by plaintiff in error"; but the brief does not point out what testimony offered by defendant was excluded.

It is contended that the court erred in permitting the witness De Long, over objection and exception by the defendant, to draw a diagram on the floor, from which he afterwards, without objection at the time, testified by designating thereon the "station," the "shanty," where plaintiff's decedent was killed, and the guard rail, between which and the main line rail he had been mashed by the wheels of the train. After answer to the fourth question referring to the plat on the floor, the defendant moved to strike this testimony out as incompetent, irrelevant, and im-

material, "the witness having made indications on the floor, that cannot be shown in the record," to which the court made no immediate response; but counsel for plaintiff responded by stating to the stenographer that: "The point indicated by the witness * * * is the point where the side track that runs on the west side of the main line joins the main line on the east rail of the main line;" to which statement defendant objected; and in response to this objection the court said: "Yes, let the witness state that, I think it would be better;" whereupon counsel for defendant stated: "That is the objection I have to the whole proposition on the floor—it don't go into the record; reference of the witness to the different points on the diagram on the floor will be unintelligible on the record;" to which the court responded: "It will unless he is careful." The record does not disclose any exception taken by defendant to either the action or inaction of the court relating to this matter except to the drawing of the diagram on the floor in the first instance, as above stated.

After a few further questions, without reference to the diagram that had been drawn on the floor, counsel for plaintiff said:

"I don't know whether the jury understand or not; the gentleman objects to my using the diagram; the main thing is to let the jury understand (here the attorney draws diagram on the floor)—now, say the straight line there indicates the one side of the angle and this curve indicates the other side of the angle that joins the main line; you say the block is driven in the angle; if I understand you, you drive the block in so as to close up this acute angle or sharp angle where this man's foot was caught, and at the end of the block the rails flare apart so as to give no chance for the man to catch his foot?"

Objection was made to this interrogative statement as follows:

"Objected to as leading and suggestive, and for the further reason that the diagram has been drawn on the floor, which cannot be incorporated in the record, to which the witness' attention has been called."

The court overruled this objection; and thereupon counsel for plaintiff asked the witness, who had not answered the question: "Can you answer that, the effect of putting the block in the angle?" Before this question was answered, the court said:

"I don't see why you can't ask the question and make it clearly intelligible to the jury without referring to the diagram;" to which counsel for plaintiff responded by saying he would try to do so; and it does not appear that there was any further reference by him to the diagram on the floor. Later defendant called upon this same witness to make and, when made, put into the record a diagram purporting to be identical with the one drawn upon the floor; and, in addition to this, later put into the record a more elaborate diagram embracing, among others, all the features of the one purporting to be identical with the one drawn on the floor. The record does not disclose that there was any difference between the diagram drawn upon the floor in respect to what it represented and those that were put into the record; but, to the contrary, all the diagrams appear identical with respect to the features shown by the one drawn on the floor.

The court should not perhaps have permitted the unnecessary drawing of the diagrams upon the floor, which could not conveniently be made part of the record, nor the testimony of the witness, nor the statement of counsel with reference to the same over the objection by defendant—at least, it is a practice not to be commended. See *Rachmel v. Clark,* 205 Pa. 314, 54 Atl. 1027, 62 L. R. A. 959; *State v. Cottrell,* 56 Wash. 543, 106 Pac. 179. But it does not necessarily follow that this was reversible error. In *Meek v. Daugherty,* 21 Okla. 859, 97 Pac. 557, it is held: "The admission of incompetent and immaterial evidence, that appears to have prejudiced the substantial rights of the party objecting to the admission thereof, is reversible error;" but can it be said that the drawing of the diagram upon the floor and the testimony and statements relating to the same appear to have prejudiced any substantial rights of the defendant? We think not.

Defendant further assigns error in that the court (fourteenth specification) refused "to give to the jury instructions requested by the defendant," and refused "to give each said instructions numbered from 1 to 17, both inclusive," and (fifteenth specification) gave "the jury instructions numbered 1 to 15, both inclusive," and gave "to the jury each of said instructions over the ob-

St. Louis & S. F. R. Co. v. Long.

jection of the plaintiff in error"; but urge error in brief only the refusal to give special instructions numbered 1, 4, 5, 6, 7, 12, 16, and 17 requested by defendant; and the giving of the court's instructions numbered 2, 9, and 10 only are urged by counsel as error.

Each and all of the instructions refused and given in which defendant contends there was reversible error, except the first and sixteenth instructions refused, relate to the defenses of contributory negligence or of assumption of risk.

The answer of defendant consisted of a general denial, allegations of contributory negligence by plaintiff's decedent, and the allegations of assumption of risk by him.

The court instructed the jury on the issue of contributory negligence as follows:

"(1)   Ordinary care, as used in these instructions, is such care as a person of ordinary prudence would exercise about his own affairs of ordinary importance.   The want of ordinary care constitutes ordinary negligence.

"(2)   Contributory negligence, as used in these instructions, is such an act or omission on the part of plaintiff's decedent which amounts to a want of ordinary care on his part, and which, concurring or co-operating with the negligent act of the defendant, is the proximate cause or occasion of the injury complained of.

"(3)   You are further instructed that, if you find from the evidence in this case that the plaintiff's decedent was guilty of contributory negligence, then the plaintiff herein cannot recover, regardless of whether defendant was guilty or not.   By contributory negligence, as already explained, is meant want of ordinary care on the part of the deceased which in some degree directly caused his injury, and without which the injury would not have occurred.   While it was the defendant's duty to provide a reasonably safe place for the deceased to work, and reasonably safe tools and appliances with which to perform his work, and maintain same in such condition, it was also the duty of the deceased, while engaged in the work assigned to him, to exercise ordinary care for his own safety; that is, such care as a reasonably prudent person of his experience and understanding would exercise under the same circumstances and conditions.   If you find from the evidence that he did not exercise such care, and was injured by reason thereof, plaintiff cannot recover herein, and your verdict should be for the defendant.

"(4)   In determining whether or not plaintiff's decedent was guilty of contributory negligence in causing his injury, you should take into consideration all the facts and circumstances surrounding him at the time he was injured, as well as his own conduct at and just prior to the accident, his age, his intelligence and understanding, the length of time he had been working in and about the defendant's yards at Francis, his previous experience in the railroad business, and, from all the circumstances and facts surrounding the deceased at the time of his injury which have been introduced in evidence before you, say in your judgment whether or not he was guilty of contributory negligence, and, if, in your opinion, he was not, then the plaintiff herein is entitled to recover; if, on the other hand, you believe that his own conduct and his own acts in some manner and in some degree contributed to his injury, then plaintiff would not be entitled to recover, and your verdict should be for the defendant."

On the issue of assumption of risk the court instructed the jury as follows:

"(5)   The said S. H. Long, when he entered the service of the defendant, assumed such risks as were ordinarily incident to the work in which he was engaged, but he did not assume any risk which might be caused by the negligence of the defendant; if, therefore, you believe that the accident which caused the death of the said Long was an accident which could not reasonably have been anticipated or foreseen and thus guarded against by the exercise of ordinary care by the defendant, and was not the result of ordinary negligence on the part of the defendant, its agents or employees, then, in that event, the injury would be one of the risks which the said Long assumed, and in such case it would be your duty to find for the defendant. If, however, you find that the death of the said S. H. Long was occasioned by the failure of the defendant company to exercise ordinary care to handle its cars, to exercise ordinary care for the safety of those working in the yards, then, in such case, the said Long would not be held to have assumed the risk, and, if the said Long was in his proper place of duty and was not guilty of contributory negligence as hereinbefore explained, it would be your duty to find for the plaintiff."

"(9)   If you believe from the evidence that the said angle where the said S. H. Long got his foot caught and was run over was unblocked, but that the same was known to the said S. H. Long, and that the dangers arising therefrom were so open and apparent that a person of ordinary prudence would not continue

to work without the same being blocked, then you will find that S. H. Long assumed the risk of danger arising from the unblocked condition of said angle, and in that event you will find for the defendant.

"(10)   If you believe from the evidence that the coupling apparatus of the car above referred to was defective, and if you believe from the evidence that the said S. H. Long knew of the same, or by the use of ordinary care in the performance of his duties could have known of the same, before he undertook to operate it, and you further believe that a person of ordinary prudence after becoming acquainted with the said defects would not have undertaken to uncouple the cars in the manner that S. H. Long did, then you are instructed that the said S. H. Long assumed the risk of being injured by uncoupling the same in the manner he did, and, if you so believe, you will find for the defendant."

"(11)   You are further instructed that as to such dangers as are patent and obvious to a person of ordinary intelligence and experience and that are known to the employee, or that ought to have been known to him in the exercise of ordinary care, the master is under no obligation to warn him against them."

Section 6, art. 23 (section 355, Williams' Ann. Ed.), Constitution of Oklahoma reads:

"The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact, and shall at all times, be left to the jury."

That these defenses in all cases are questions of fact and must be left to the jury, see, also, the following cases: *Chicago, R. I. & P. Ry. v. Beatty,* 27 Okla. 844, 116 Pac. 171; *Independent Cotton Oil Co. v. Beacham,* 31 Okla. 384, 120 Pac. 969; *Phoenix Printing Co. v. Durham,* 32 Okla. 575, 122 Pac. 708, 38 L. R. A. (N. S.) 1191; *Chicago, R. I. & P. Ry. Co. v. Hill,* 36 Okla. 540, 129 Pac. 13, 43 L. R. A. (N. S.) 622; *Dewey Portland Cement Co. v. Blunt,* 38 Okla. 182, 132 Pac. 659.

Neither the defense of contributory negligence nor the defense of assumption of risk can arise, of course, unless the defendant has been guilty of negligence which, but for one or both of these defenses, would render it liable for damages to the plaintiff.   Until then there is nothing against which to make defense; but, if there be evidence from which the jury may find

the defendant guilty of such negligence, these defenses, if they exist in fact, are available to the defendant. The section of the Constitution just quoted expressly recognizes these defenses as they existed, especially in their aspects as questions of fact, at the time of the adoption of the Constitution, although we express no opinion as to whether statutory change could be made; but it is quite clear from the language used that neither of them nor any question found in the evidence or want of evidence on an issue made by pleading either or both of these defenses can arise in any case as a question of law for the judge. The judge no doubt should, in leaving these defenses to them, inform the jury what these defenses are, that is, should define contributory negligence and assumption of risk in relation to the evidence and where the burden of proof lies in proper instructions, and inform them of the legal effect of same. The jury no doubt should, as a matter of fact, infer contributory negligence and assumption of risk or the absence thereof where the courts of this jurisdiction, as a matter of law, were accustomed to infer or presume the same prior to the adoption of this section; and it may be that the judge should advise the jury of such inferences and presumptions; but the jury alone can, with binding effect, say what inferences and presumptions of fact may be indulged in determining these defenses. The language of this section and the cases hereinbefore cited do not permit any other interpretation or construction; and there is nothing in the history of the provision under consideration to suggest any other intent on the part of the convention that framed or the people who adopted the Constitution.

It is urged by counsel for defendant in brief and oral argument that this provision of our Constitution is merely declaratory of the pre-existing law; but this contention is conclusively answered by the cases hereinbefore cited, and especially that of *Independent Cotton Oil Co. v. Beacham,* 31 Okla. 384, 120 Pac. 969, in which it is said:

"Another point is made that the proposition that our constitutional provision, providing that the defense of contributory negligence or assumption of risk is a question of fact to be sub-

mitted to the jury, is merely declaratory of the common law that, when the court has found that there is legal evidence tending to show negligence or contributory negligence, it is for the jury to determine from the evidence whether negligence or contributory negligence exists. Citing *Kiley v. C., M. & St. P. Ry. Co.*, 138 Wis. 215, 119 N. W. 309, 120 N. W. 756. To give the Wisconsin provision the construction contended for by the plaintiff in that case would have the effect of conferring judicial power on juries, in violation of article 7, sec. 2, of the Constitution of Wisconsin, which confers all judicial power upon designated courts. In the case at bar the provision under discussion is a constitutional provision, and, of course, it is not necessary to resort to construction to harmonize it with any other enactment. Upon its face, it seems to be plain and unambiguous. It provides that the 'defense of contributory negligence and of assumption of risk shall, in all cases whatsoever, be a question of fact, and shall, at all times, be left to the jury.' "

As to the law of contributory negligence:

In *Ladow v. Oklahoma Gas & Electric Company*, 28 Okla. 15, 119 Pac. 250, it is said:

"Contributory negligence is nothing more nor less than negligence on the part of the person injured, and the rules of law applicable to the negligence of a defendant are applicable thereto. *Pitman v. City of El Reno*, 2 Okla. 414, 37 Pac. 851. Negligence, as defined by section 2830, Comp. Laws of Oklahoma 1909, is as follows: 'The terms "neglect," "negligence," "negligent," and "negligently," when so employed, import a want of such attention to the nature or probable consequences of the act or omission as a prudent man ordinarily bestows in acting in his own concerns.' "

In 29 Cyc. 505, it is said:

"Contributory negligence in its legal significance is such an act or omission on the part of plaintiff, amounting to an ordinary want of care, as concurring or co-operating with the negligent act of defendant is the proximate cause or occasion of the injury complained of."

In *Little v. Hackett*, 116 U. S. 366, 6 Sup. St. 391, 29 L. Ed. 652, it is held:

"That one cannot recover damages for an injury to the commission of which he has directly contributed is a rule of established law and a principle of common justice. And it matters not whether that contribution consists in his participation in the

direct cause of the injury, or in his omission of duties which, if performed, would have prevented it."

As to the law of assumption of risk:

In *Sans Bois Coal Co. v. Janeway,* 22 Okla. 425, 99 Pac. 153, it is held:

"Assumption of risk 'is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk.'"

See 1 Words and Phrases, 589, where the following cases are cited: *Bauer v. American Car & Foundry Co.* [132 Mich. 537] 94 N. W. 9, 10 (citing *Narramore v. Cleveland, C., C. & St. L. Ry. Co.,* 96 Fed. 301, 37 C. C. A. 501, 48 L. R. A. 68); *Atchison, T. & S. F. Ry. Co. v. Bancord,* 66 Kan. 81, 71 Pac. 253; *Green v. Western American Co.,* 30 Wash. 87, 70 Pac. 310, 317.

The foregoing instructions given by the court, in the light of the authorities just quoted, appear free from reversible error on any point urged against them by defendant, although the jury is thereby informed that the plaintiff's decedent "did not assume any risk which might be caused by the negligence of defendant" and is nowhere informed that the defenses of contributory negligence and assumption of risk are questions of fact of which they are the exclusive judges. The defendant neither in brief or oral argument insists upon this omission as error. The omission is in accord with the contention of defendant both in the trial court and here, and the error, if any, is waived.

In *Citizens' Bank & Trust Co. v. Dill,* 30 Okla. 1, 118 Pac. 374, it is held:

"It is the rule and repeated holding of this court that alleged errors, other than those affecting jurisdiction, not specifically pointed out and insisted upon in plaintiff in error's brief, will be treated as waived."

It is urged upon the authority of *Gilbert v. Burlington, C. R. I. & N. Ry. Co.,* 128 Fed. 529, 63 C. C. A. 27, that the definition of contributory negligence as given in the court's foregoing

instruction number two is not correct; but we are unable to find in that case any authority for its condemnation, although it is there held:

"The test of contributory negligence is whether or not the want of care directly contributes to the injury, not whether it is the more proximate cause of it than the negligence of the defendant. If it directly contributes to the injury, it is fatal to the plaintiff's recovery, although the negligence of the defendant may be the more proximate cause of it."

In the fifteenth instruction requested by the defendant and refused by the court it is stated:

"You are instructed that the test of contributory negligence is whether or not the want of care directly contributed to the injury, not whether or not it was the more proximate cause of it than the negligence of the defendant. If it directly contributed to the injury, it is fatal to the plaintiff's recovery, although the negligence of the defendant may be the more proximate cause of it."

This instruction merely emphasizes and illustrates, by more specific and a different form of statement, a proposition of law that is fairly embraced in the foregoing instructions given by the court.

In *St. Louis & S. F. R. Co. v. Walker,* 31 Okla. 494, 122 Pac. 492, it is held:

"It is not error to refuse to give an instruction that correctly states the law, if substantially the same instruction is embodied in the charge of the court to the jury, and the charge, taken as a whole, correctly states the law applicable to the facts in the case."

To the same effect see the following cases: *Standifer v. Sullivan,* 30 Okla. 365, 120 Pac. 624; *National Drill & Mfg. Co. v. Davis,* 29 Okla. 625, 120 Pac. 976; *Scott v. Vulcan Iron Works,* 31 Okla. 334, 122 Pac. 186; *Eisminger v. Beman,* 32 Okla. 818, 124 Pac. 289; *Enid City Ry. Co. v. Reynolds,* 34 Okla. 405, 126 Pac. 193; *Enid Electric & Gas Co. v. Decker,* 128 Pac. 708; *St. Louis & S. F. R. Co. v. Bilby,* 35 Okla. 589, 130 Pac. 1089.

The sixteenth instruction requested by defendant and refused by the court reads:

"You are further instructed that the mere fact that the defendant did not block the frogs, guard rails, and angles between

the side tracks and the rails of its main track will not warrant you in finding that the defendant was negligent, and such omission on the part of the defendant ˙does not amount to negligence as a matter of law."

It may be that this instruction was intended to present the idea that negligence could not be predicated upon the unblocked condition of the space between the convergent rails where the decedent's foot was caught, upon all the evidence relating to that subject; but it was susceptible of being understood as less comprehensive of the evidence to which it relates, and as meaning that proof of nothing more than the unblocked condition of this space was not sufficient proof of negligence on the part of defendant, a meaning less favorable, of course, to defendant than the former, if we assume, as we will for the purpose of present discussion, that the evidence as a whole on this subject was not sufficient to show negligence. In other words, assuming for the present purpose only that defendant was entitled to an instruction to the effect that the unblocked condition of the space between the guard and main line rails, under all the evidence, including the evidence as to the peculiar situation and right use of this space and the effect and custom of blocking, did not constitute negligence, was it material, in view of the additional evidence, to determine whether the mere fact that the defendant did not block the frogs, guard rails, and angles between the side track and the rails of its main track, might constitute negligence; and did the court err in refusing the instruction merely as not presenting to him a question based on all the evidence relating to this subject? The evidence shows, and indeed it is a matter of common knowledge, that such open spaces as that in which the decedent's foot was caught are dangerous, especially in the nighttime, to employees working in such a yard; and the evidence further shows not only that such danger may be eliminated by blocking, but that of three other roads, for which the only witness questioned on this subject had worked, two of them used the block system, and the other, like defendant, did not.

The decided cases upon the question presented by the instruction under consideration are not in harmony; and this lack of harmony is reflected in the following authorities:

In 3 Elliott on Railroads, 1272a, it is said:

"It is generally held that the operation of a railroad without blocking its frog, switches, or guard rails is not negligence. It is certainly not negligence as a matter of law in the absence of any statute upon the subject, although there are cases holding that the question is for the jury."

In 1 Labatt on Master and Servant, 69, it is said:

"The position taken in some jurisdictions seems to be that a jury may properly infer negligence from the mere fact that a frog or guard rail was not blocked. The obvious complement of the doctrine is that the court cannot say, as a matter of law, that culpability is imputable where nothing more appears than that there was a want of blocking. Another view is that the servant, in order to make good his right of recovery, must do more than establish the want of blocking. That is to say, he has the burden of proving that frogs, etc., are not reasonably safe for the purposes which they are designed to subserve, and must also show that on the whole, the use of the block would be prudent, in that it would guard against dangers in one direction, without introduction of new perils in another. * * * He cannot recover merely upon evidence that an increase of safety is obtained by using the blocks. * * * In many of the cases the circumstances with reference to which the question of reasonable safety has been considered has been the common usage of railway companies. In order to estimate the doctrinal significance of these decisions, the theory held by the courts which rendered them must be taken into account. In some jurisdictions, * * * proof that it is the common usage of railway companies not to block frogs or guard rails will prevent recovery, as a matter of law. In others, such evidence is merely treated as an element proper for the consideration of the jury. A conception sometimes relied upon has been that the risk created by the unblocked frogs was obvious, and therefore assumed. In one case this seems to stand as the specific and differentiating reason upon which recovery was denied. But most of the decisions in which phraseology indicative of the conception is employed emanate from courts of which at least a part would deny the master's liability, even apart from this consideration."

In many of the decided cases it does not appear that any nice distinction was made or necessary to be made to a correct disposition of the case between negligence on the part of the railroad company and assumption of risk on the part of the em-

ployee; and the courts, in holding negligence could not be predicated upon the want of blocking, have generally held in the same cases that the employee assumed the risk, while the courts holding that the question of negligence in permitting the unblocked condition of such spaces was for the jury have generally held in the same cases that the employee did not, as a matter of law, assume the risk. Indeed, in all the jurisdictions in which we have found decided cases in point there has been no imperative necessity for differentiating between want of negligence on the part of the railroad company and assumption of risk on the part of the employee; but in this jurisdiction, where the defense of assumption of risk on the part of the decedent is a question of fact for the jury, the court must of necessity differentiate in determining whether, as a matter of law, there is evidence warranting the jury in finding the defendant guilty of such negligence; and the value of the decided cases in such other jurisdictions as precedents for our guidance in finding this line of demarcation is not so great as it otherwise would be. There was another subject of negligence presented by the general instructions to the jury upon which the verdict might rest; and it was not necessary for the trial court to determine whether negligence in the defendant could be predicated upon the unblocked condition of this particular space under the evidence in this case, unless the question was fairly presented to him by the instruction under consideration.

Assuming, without deciding, that defendant would have been entitled to have the jury instructed that negligence could not be predicated upon the unblocked condition of this particular space under the evidence in this case, upon the theory that it was necessary for plaintiff to have further shown, and that she did not show, that blocking would not have introduced any new danger nor involved any unreasonable expense, or that the same is a customary safety device for such space, was the trial court not, in the light of what has already been said, justified in refusing it because it omitted material elements or facts on the subject to which it related and left undisposed of the effect of proof of safety in blocking and the peculiar situation and purpose of this guard rail and space? If this instruction had been given, the

jury would have been left without guidance as to the effect of the proof of safety to employees in blocking and of the peculiar situation and purpose of this guard rail and space upon the question of negligence in this respect; and it was not material for the court or jury to determine whether the mere proof of want of blocking, considered apart from the proof of safety to employees in blocking and the peculiar situation and purpose of this particular guard rail and space, was sufficient to support a verdict against defendant.

In Hughes Instructions to Juries, 27, it is said:

"An instruction which omits any material element or fact on the subject to which it relates is defective, and for that reason it is properly refused. Such defective instructions, though correct in other respects, may be refused."

In 38 Cyc. 1627-1628, it is said:

"Instructions which ignore or exclude from the consideration of the jury evidence which is competent and material to the issue involved are erroneous, and this is so, although the evidence is slight; and it is of course proper to refuse instructions which are defective in this respect."

It may be, and, so far as we have examined the cases, is true that this rule is supported only by cases in which the instruction requested and refused was more favorable to the party asking it than it would have been if it had embraced the omitted facts on that subject; and it may be that, as a general rule, an instruction cannot be refused when less favorable in such respect to the party asking it than such party was entitled to have it; but in a case like this, where there was another subject submitted to the jury upon which negligence might have been predicated, and where the requested instruction may have been understood by the trial court as impliedly admitting that proof of facts in addition to the mere fact of the unblocked condition of the space might justify the predication of negligence upon such unblocked condition of this space, and where the defendant does not request an instruction involving the consideration by the trial court of the effect of all the evidence relating to this subject apart from the other subject of negligence, we doubt if it can be said that the question of sufficiency of the proof of negligence upon

this one subject of negligence was fairly presented to the trial court for decision.

In the foregoing discussion of this requested and refused instruction we have assumed that, upon all the evidence, the court should have instructed, if it had been requested, that negligence against the defendant could not be predicated upon the unblocked condition of the space between the convergent rails in question under all the evidence; but is it true that it could not? It is indisputable that no negligence is found by failure of a master to adopt a device which, so far as it appears, has not been discovered or come to be known as a practical utility, but this rule does not mean that railroad companies are not bound to keep themselves reasonably abreast with approved methods, so as to lessen the danger attendant on the service, and, while they are not required to adopt every new invention, it is their duty to adopt such as are in ordinary use by prudently conducted roads engaged in like business and surrounded by like circumstances. *Richmond, etc., R. Co. v. Jones,* 92 Ala. 218, 9 South. 276; *Georgia Pac. Ry. Co. v. Propst,* 83 Ala. 518, 3 South. 764. There has been such improvement in the machinery and appliances used by railroads, for the better security of life, limb, and property, that it would be inexcusable to continue the use of old methods of machinery and appliances known to be attended with more or less danger, when the danger could be reasonably avoided by the adoption of the newer, and which are in general use by well-regulated railroads. *Louisville, etc., Ry. Co. v. Allen,* 78 Ala. 494; *Loyd v. Hanes,* 126 N. C. 359, 35 S. E. 611; *Gulf, etc., R. Co. v. Warner* (Tex. Civ. App.) 36 S. W. 118; *Tennessee, etc., R. Co. v. Kyle,* 93 Ala. 1, 8 South. 764, 12 L. R. A. 103; *Greenlee v. Southern Ry.,* 122 N. C. 977, 30 S. E. 115, 41 L. R. A. 399, 65 Am. St. Rep. 734; *Harden v. N. C. R. Co.,* 129 N. C. 354, 40 S. E. 184, 55 L. R. A. 784, 85 Am. St. Rep. 747; *France v. Rome, etc., Co.,* 88 Hun, 318, 34 N. Y. Supp. 408; *Burke v. Witherbee,* 98 N. Y. 562.

In the case of *France v. Rome, supra,* the court held that the best known or conceivable appliances need not be furnished, but that the test was such as a prudent man would furnish if his life

were exposed to the danger that would result from unsuitable or unsafe appliances.

In a note to 1 Labatt, *supra,* it is said:

"The following vigorous argument by Lewis, J., in his dissenting opinion in *Richmond & D. R. Co. v. Risdon* (1891) 87 Va. 335, 12 S. E. 786, is worth quoting: 'That the frogs were dangerous is not disputed, but it is contended that they were the standard pattern, and that that fact of itself repels the imputation of negligence. From this view I dissent. If a standard frog, unguarded, and situated, as this one was, in a place where there are many tracks, and where cars are shifted at all hours of the day and night, is not reasonably safe, then the company, in allowing it to remain unguarded, was guilty of negligence, and the jury rightfully so found. Nor, upon this point, are we left to inference. The expert evidence for the plaintiff is conclusive that the dangerous condition of the frogs could easily have ·been guarded against by the device of "filling" them with cinders, which simple and inexpensive method renders them safe to those whose duties call them upon the track, and at the same time does not interfere with their ordinary use. The witness Perry, who for a number of years was in the employ of the defendant company as roadmaster, testifies that at terminal points, or in yards where much shifting is done, the frogs ought always to be filled, as a protection to switchmen; and this is so well understood, he says, that the laws of some states expressly require it to be done. And why should they not be filled? Why should the servant be exposed to unnecessary risks that can so easily be guarded against? Is the rule that the master must exercise reasonable or ordinary care a meaningless phrase—the mere jingle of words? I think not.'"

And this reasoning, as applied to the space in which decedent's foot was caught, appeals to us very strongly.

The following cases cited in the same note tend to support the view that the question of negligence in the unblocked condition of frogs, angles or guard rails is for the jury: *Sherman v. Chicago, M. & St. P. Ry.* (1885) 34 Minn. 259, 25 N. W. 593; *Trott v. Chicago, R. I. & P. R. Co.* (1901) 115 Iowa, 80, 86 N. W. 33, 87 N. W. 722; *Mayes v. Chicago, R. I. & P. Ry. Co.* (1884) 63 Iowa, 562, 14 N. W. 340, 19 N. W. 680; *Hamilton v. Rich Hill Coal Mining Co.* (1891) 108 Mo. 364, 18 S. W. 977; *Missouri, P. R. Co. v. Baxter* (1894) 42 Neb. 793, 60 N. W. 1044; *O'Neill v. Chicago, R. I. & P. Co.* (1901) 62 Neb. 358,

86 N. W. 1098; *Holum v. Chicago, M. & St. P. R. Co.* (1891) 80 Wis. 299, 50 N. W. 99. A case which also tends to support the same view is *Union P. R. Co. v. James* (1896) 163 U. S. 485, 16 Sup. Ct. 1109, 41 L. Ed. 236; but the rulings were on points of procedure. And the case of *Southern P. Co. v. Seley* (1894) 152 U. S. 145, 14 Sup. Ct. 530, 38 L. Ed. 391, seems to commit the Supreme Court to the theory that evidence merely of the want of blocking is not enough to establish culpability. Also see, as holding that question for the jury, the following cases: *McManus et al. v. Oregon Short Line R. Co.* (1906) 118 Mo. App. 152, 94 S. W. 743.

In *Union Pacific R. Co. v. James, supra,* it is held in the syllabus:

"Testimony by plaintiff that the frog in which he was injured was unblocked at the time of the accident is sufficient to carry the question to the jury, though a number of witnesses testified that, just after the accident, the frog was found to be properly blocked. * * *"

But it is said in this case:

"The charge in the petition was that the frog was not, and never had been, blocked. The answer denied this fact, and did not assume to set forth as a defense that it had once been blocked, and the block misplaced without the knowledge of or notice to the railroad company. The railroad company was apparently content to rest its defense upon the single question of the existence of blocking at the time of the injury. The testimony went to that alone."

The argument first advanced by counsel for the railroad company on motion for new trial in that case was that "even if the frog was unblocked, that fact, of itself, would not make defendant liable for the injuries resulting therefrom; that the proof must go further, and bring to the defendant knowledge of such unblocked condition;" and the Supreme Court held that the issues made by the pleadings and the silence of the testimony in respect to the prior situation narrowed the inquiry of the injury to the single matter of the condition of the frog at the time of the accident. The question as to whether negligence could be predicated upon the unblocked condition of a frog or other angle in a case

where the railroad company did not use the block system was not presented by that case.

In the earlier case of *Southern Pac. Co. v. Seley, supra,* as reported in 14 Sup. Ct. 530, it is held in the syllabus:

"It is not negligence to use unblocked frogs in a railroad freight yard, whereby the feet of employees coupling cars are liable to be caught, it appearing that unblocked frogs are generally used in the same section of the country, and that it is doubtful whether they are not the better kind."

But in that case the decedent put his foot into the frog in attempting to make a coupling and, although warned to take it out, did the same thing immediately afterwards, when he was killed; and the Supreme Court said, as a matter of law, he assumed the risk and was also guilty of contributory negligence.

These are the only cases we find decided by that court in any way involving the question here; and it will be seen from what has already been said as to them that they are not distinctly and clearly in point here.

The evidence as to the practicability of a block in the space between the guard rail and main line rail in question here is certainly meager and unsatisfactory; but, in view of the great danger involved in such open spaces, the situation of this particular space, the absence of any appearance of danger or impracticability in blocking from the facts proven, and the safely assumed advantageous situation of the defendant with respect to ability to produce expert evidence which it did not produce as to the same, we are unable to say, as a matter of law, that negligence could not be predicated upon the unblocked condition of this space under all the evidence relating to that subject. In saying this, we are not unmindful of the fact that the burden of proof was upon the plaintiff; but, in the light of all the facts and circumstances we have stated, we are unable to say that the proof was not sufficient to go to the jury.

The defendant further assigns error in that the court (sixth specification) refused to sustain demurrer to evidence and (thirteenth specification) refused peremptory instruction, also (fourth specification) the verdict of the jury is not sustained by suffi-

cient evidence, and (fifth specification) the verdict of the jury is contrary to law.

The question of negligence in the speed at which the train was backed was not submitted to the jury—the question of negligence in permitting the unblocked space between the convergent rail and the defective condition of the equipment for uncoupling only being submitted.

About two o'clock on the morning of March 15, 1909, defendant's extra freight train, consisting of about twenty cars, more or less, came from the south into its south yard and stopped south of the switch at the north end of the same, at Francis, Okla. It was the duty of defendant's car inspector, W. J. Thrasher, with his helper, Wilcox, to thereupon take charge of the train, inspect the cars, mark those in bad order by placing a red "bad order" card on them, and when through inspecting to surrender the train to plaintiff's decedent, S. H. Long, the foreman of the switch engine crew; and accordingly this inspector, with his helper, took charge of this train and commenced inspection with the car on the north end of the train about the time the road engine was uncoupled and taken away. They proceeded with the work of inspection along the cars toward the south, the inspector on the west and his helper on the east side, until they had inspected three, four, or five cars; but according to the testimony of the inspector, at this time the switch engine coupled onto the car from which the road engine had been taken and commenced to draw the entire train of cars to the north of the said switch for the purpose of switching, while the testimony of the yardmaster was to the effect that the work of inspection had been completed before the work of switching was begun. The inspector had exclusive control and could, it seems, have prevented any movement of the cars until he had completed his inspection; but, instead, according to his testimony, he simply held his light so as to inspect them as best he could as they passed him, with intent to make a more careful and thorough inspection at some subsequent time. He observed that all the draft bolts on one side of a box car except one were broken; and as Frisco coal car No. 11935 passed him he observed that a queen-

post used to support a truss rod was loose and that a drawbar in the coupling equipment in one end of the car seemed drawn out a little too long; but observed no defect in the equipment for uncoupling; and he did not put the usual "bad order" card on this car. After the train had passed him he crossed to the east side of the main track upon which it had gone north and followed north to where S. H. Long, plaintiff's decedent, was standing, somewhere near but north of the switch at the north end of this yard.

S. H. Long at this time, as foreman of the switch engine crew, and in discharge of his duties as such, after a train of cars was turned over to him by the inspector, had the control over the same, for the purpose of switching and placing cars, similar to that a conductor on the road has over his train.

In this south yard there were two tracks on either side of the main line on which the train of cars had gone north as stated. The caboose, due to be placed on the caboose track, and a box car, said by Martin J. De Long, defendant's night yardmaster at the time, to have been in bad order and due to be placed on the repair track, had been left on the main line at the time the train of cars were first taken north by the switch engine; and it appears that, about the time the inspector approached plaintiff's decedent somewhere near but north of the switch mentioned, as above stated, three cars on the rear of the train had been "kicked" onto and cut off and left on the second track west of the main line, known as the stock track. About this time the inspector, according to his testimony, informed plaintiff's decedent that "this car" (referring to Frisco coal car No. 11935, which was about to pass, was passing, or had passed where they were standing) "and a box car is a bad order;" and plaintiff's decedent acknowledged the information only by asking: "How bad is the box car?"

The evidence does not clearly show how near the inspector was to either "this car" or to plaintiff's decedent at the time, nor throw any further light upon the question as to whether plaintiff's decedent actually received the information and understood therefrom that Frisco coal car No. 11935 was in bad order, and his inquiry suggests a question for the jury as to whether he did

actually receive the information intended by the inspector to be given him as to "this car," or whether he did not inquire about the extent of defect in the coal car because the same was in view.

It was the duty of plaintiff's decedent as switch engine foreman, subject to the instructions from the night yardmaster, said Martin J. De Long, to switch and place for future use all the cars in the train, except "bad order" cars, which his duty required him to place on the repair track for repairs. It appears that the only instruction given plaintiff's decedent by the night yardmaster at the time this train came in was to take out from the train the four or five cars for Holdenville, a station a short distance away; and it appears that the four or five cars, including Frisco coal car No. 11935, were due to go at once to Holdenville, unless this defective car should have been detained for repairs.

After "kicking" the three cars down on the stock track as already stated, and after the inspector had walked south about 50 or 60 yards from plaintiff's decedent, the train was backing south for the purpose of "kicking" this Frisco coal car No. 11935 off down the main track toward the caboose and the box car with it when the accident resulting in the death of plaintiff's decedent occurred; but it does not appear certain whether this Frisco car No. 11935 was being so placed for the purpose of being put into the Holdenville train, as the night yardmaster testified, or for the purpose of being afterwards put on the repair track with the bad order box car, either inference being apparently possible under the testimony. The switch engine crew consisted of the engineer, the fireman, and one helper by the name of Parker, who was temporarily and excusably a short distance away from this work of switching at the time of the accident; and plaintiff's decedent evidently undertook to and did in fact uncouple Frisco coal car No. 11935 while it was being so "kicked" down the main line to the desired position, and lost his life in so doing.

"This car" and the one to which it was coupled were each provided with automatic couplers, and each provided with a lever extending along the end out to the side of the car for use in uncoupling by the switchman without going in between the cars. Plaintiff's decedent was on the east side of these cars, and the

uncoupling lever on Frisco coal car No. 11935 was also on the east side of the coupling equipment; but the lever for uncoupling the other car was on the opposite and west side of the coupling equipment, beyond his reach. The "dead wood" over the draw-bar on the end of this Frisco coal car No. 11935 had in the course of time been beaten off underside so as to permit the drawbar to go back under the upper part so far as to take under it the lock block or coupling pin in the equipment of this car, and thus make it impossible to effect an uncoupling by use of the lever on this side of the train or by lifting this lock block or coupling pin by hand, so that he was confronted by the alternative of stopping the train or going between the moving cars in order to effect an uncoupling.

It appears that some rule of the company not in evidence, except by the admission in a general way of a witness on cross-examination, forbade the uncoupling of cars by going between them while in motion; but it also appears that the practice of the employees of the company at Francis was to effect uncouplings by doing so, while the trainmaster, who had authority to discharge such employees for violating rules, was in the yards in both day and night time while it was being done, as well as other times, although there is no proof that the trainmaster actually saw and acquiesced in such violation of rules other than may be found in the evidence of his opportunity to have seen the same.

The inspector had, at the time of the accident, walked south some 50 or 60 yards, as already stated, when, being on the main line, down which Frisco coal car No. 11935 was being "kicked," heard the cars coming at such speed as to cause him, in a sense of precaution against danger, to look back to see how near they were to him; and, in looking back he saw what appeared to be a spark as it flew out to one side of the train. The inspector thought that a brake beam had fallen and had thrown off this spark, and he walked back to where it appeared to be to investigate. When he got near enough he saw, by the use of his lantern, plaintiff's decedent mashed on and between the guard rail to the east and the east rail of the main line about a rod south of the switch.

At the time of the accident, the night yardmaster was on or near the stock track some 100 or 150 yards to the south and away from the place thereof; and, after his attention was attracted in that direction by the exhaust of the engine and the speed of the cars, he was informed of the same by the inspector.

The inspector and the night yardmaster each testified to stopping the train by signalling as soon as the accident was discovered; and each testified that the train was stopped in obedience to his signal; but the night yardmaster testified that the engineer thereupon pulled the train forward the length of half a car and pulled one pair of trucks over plaintiff's decedent, and, when cross-questioned as to whether or not the sudden stopping of the engine might have caused the cars to go forward on recoil ten or twelve feet, insisted that he knew by the exhaust of the engine that the engineer had gone forward after stopping.

The only witnesses who claimed any personal knowledge of the accident or any fact immediately connected therewith were the night yardmaster, Martin J. De Long, the principal witness for the plaintiff, who soon after the accident had been discharged by defendant because of unsatisfactory service according to a statement in his service letter, and the car inspector, W. J. Thrasher, the only witness for the defendant, still in its employ —nor was there any other witness in the case except the plaintiff; and neither party accounts for the absence of the testimony of the engineer, the fireman, the inspector's helper, or the plaintiff's decedent's helper.

The night yardmaster testified for plaintiff that at the time of the accident the train was being backed at a speed of at least twelve miles per hour; but, on cross-examination, he was confronted by a report he made immediately after the accident stating the speed as six miles per hour. He at first intimated that this report was not correct and was made in fear of loss of his job, but later admitted it must have been true and that he must have been mistaken in his testimony that the speed was at least twelve miles per hour, as he would not have made a false report, although, on later redirect examination with respect to his report of six miles per hour, he finally said it always seemed to him that

St. Louis & S. F. R. Co. v. Long.

it was going faster than that. This witness also testified that they "hardly ever 'kicked' them that hard, though, to roll that far"—referring to the speed of the train at the time of the accident.

On cross-examination, the car inspector, a witness for the defendant, at first testified the speed of the train at the time of the accident was ten miles per hour, but later testified it was from six to eight miles per hour, and finally said he did not know.

When the train was stopped by the signals mentioned, plaintiff's decedent was found to be dead under the eighth car from the one he had evidently undertaken to uncouple; and it was found that his left foot had been caught and was fastened between the guard rail and the east main line rail, and the wheels of the cars had passed over his left ankle, cutting it off, and had crushed his left leg, his body, and one of his arms between the guard rail to the east and the east rail of the main line about a rod south of the switch—he was evidently dead before the accident was discovered by either of the witnesses, one of whom said the passing of one of the trucks over him would have killed him. The left foot of plaintiff's decedent was fastened in the space between these convergent guard and main line rails, with toe to the south, indicating that while in between the cars in motion his foot had passed in, where the width between the two rails was sufficient to receive the same, and had been forced along between these convergent rails to where they were so close together at the top of the rails that he could not extricate it; and he had been thus thrown down upon the rails and run over and killed by the moving train immediately after he had effected the uncoupling.

The convergent rails (including guards, frogs, and angles) in defendant's yards at Francis at the time of the accident were unblocked, and it appears from the evidence that by placing blocks of wood or metal between such convergent rails where one's foot might enter the danger of such accidents could have been obviated; but it does not appear from the evidence what the cost of so doing would have been, nor whether such blocks increased the

danger of derailment or any other danger. The plaintiff's wit-
ness, the night yardmaster, testified to knowledge of such block-
ing being at two places on another road in Oklahoma, and on still
another road at Amarillo, Tex., where he was employed as switch-
man at the time he testified; but, in addition to the defendant,
he specified another road which did not block its frogs and angles
when he worked for it. It appears that there was no eyewitness
to the accident, at least no one was produced upon the trial who
saw it; and the only proof as to what was done by plaintiff's de-
cedent or whether the car was in motion or standing still at the
time he went between them is found in such inferences as the jury
might properly have drawn from the foregoing facts. There is
no evidence that he did or did not signal the engineer; but it
seems quite certain that plaintiff's decedent went between the
cars for the purpose of effecting an uncoupling; and whether he
first, in ignorance of the defective condition of the uncoupling
equipment on coal car No. 11935, attempted to effect the same
by use of the lever from the outside and, failing, then went be-
tween the cars and attempted to draw the lock block or pin by
hand in the coupling equipment of that car, and finally effected
an uncoupling by drawing the lock block or pin in the coupling
equipment of the other car, was left entirely to inference by the
jury from the aforesaid proven facts and common knowledge as
far as permissible in respect to such matters; but at the time he
was killed an uncoupling had been effected by lifting the pin in
the coupling equipment of such other car; and the evidence tends
to show he had the pin in hand when his foot was caught and
held to it as long as he could. It appears that the next cars were
to be switched to the stock track, and that the uncoupling of
Frisco coal car No. 11935 should have been effected before the
switch was reached; but it does not appear otherwise than from
his position north of the switch a short time before at what place
plaintiff's decedent first attempted it.

It will be seen from what has already been said in discussing
another specification that defendant's sixth, thirteenth, sixteenth,
fourth, and fifth specifications of error cannot be sustained; but,
assuming, for the purpose of discussion, that negligence cannot

be predicated upon the unblocked condition of the space between the guard and main line rails, is there not evidence sufficient to have gone to the jury on the question of negligence in the defective condition of the equipment for uncoupling? The fact that the railroad company had in operation a car with defective drawheads, and that a coupling could not be properly made in the way it could have been had the coupling device been in repair, tends to show negligence on the part of the railroad company, according to *Gilliland v. Charleston, etc., R. Co.*, 86 S. C. 137, 68 S. E. 186.

In *Northern Pac. R. v. Tynan*, 56 C. C. A. 192, 119 Fed. 288, it is held:

"It is the duty of a railroad company, which it owes to its employees as well as to the public, to use reasonable care to see that the cars used on its road are in good order and fit for the purposes for which they are intended; and an employee has the right to rely upon the performance of this duty. * * *"

In *Houston, etc., R. Co. v. Myers*, 55 Tex. 110, it is held:

"The company is required, by the plainest dictates of reason and rules of law, to furnish to its servants operating trains good, sound, and suitable machinery, apparatus and material necessary in the conducting of that business; and generally the company is liable to its servants for injuries resulting from the use of defective machinery, apparatus, or material in the discharge of their duty, provided the company knew, or could have known by reasonable care, that the same was so defective or unfit for the purposes for which it was furnished."

In *Troxler v. Southern R. Co.*, 122 N. C. 902, 30 S. E. 117, it is held that a railroad company was negligent in using on its cars drawheads that were defective and dangerous; and in *Branz v. Omaha, etc., R., etc., Co.*, 120 Iowa, 406, 94 N. W. 906, it is held that, when a defect in a drawhead is shown to have existed such a length of time that the company ought to have been aware of it, there is negligence.

In *Bradshaw v. C., R. I. & P. Ry. Co.*, 58 Kan. 618, 50 Pac. 876, where the evidence showed that if the middle projection had been whole it would have prevented the coupler from passing back far enough to injure the hand of the switchman, but, the whole front of it being broken out, the short end of the

coupler slipped in between the upper and lower projection far enough to allow the long end to strike his hand; and it being shown that, although the switchman had not noticed the broken condition of the car, the accident occurring at night, and had no knowledge of the defect before the accident, it had been used in its broken condition a month or more, the court, in reversing the judgment sustaining a demurrer to the evidence, said:

"There certainly was ample evidence of neglect on the part of the company. A defective appliance was in use in connection with one of the most hazardous branches of the company's business. It had been used in that condition for a sufficient time to enable the company, in the exercise of reasonable care, to discover the defect."

In the case of *Belt Ry. Co. v. Confrey,* 209 Ill. 344, 70 N. E. 773, it was held that, where the evidence tends to show that a reasonably careful examination would have disclosed to the inspector that the coupling apparatus was defective, the determination of the issues of negligence is one for the jury.

In the case at bar the jury was left to infer from the very indefinite statement that the defect, consisting of the "battered-up" condition of the bottom of the "dead wood," was "not new" and "was not what you might call old," how long this defect had existed; but we cannot say, as a matter of law, that it was not shown by this evidence to have existed long enough to charge the defendant with knowledge. It was also for the jury to say, under the facts in this case, whether the inspector, and through him the defendant, by reasonable inspection, should have discovered this defect immediately before the decedent undertook to effect the uncoupling resulting in his death; and it was for the jury to say whether defendant was guilty of negligence in permitting that defect without informing the decedent of the same, and whether he was sufficiently informed.

In *Booker Tobacco Co. v. Waller,* 38 Okla. 47, 131 Pac. 537, the Supreme Court of this state following *Fidelity Mutual Life Ins. Co. v. Stegall et al.,* 27 Okla. 151, 111 Pac. 389, it is held:

"It is only when the evidence with all the inferences the jury could justifiably draw from it will be insufficient to support a verdict for plaintiff, * * * that the court is authorized to

direct a verdict for defendant; and, unless the conclusion follows, as matter of law, that no recovery can be had upon any view that can be properly taken of the facts which the evidence tends to establish, the case should be left to the jury under proper instructions."

A case will not be reversed for want of evidence, if there is any evidence, including every valid inference the jury could have drawn from the same, reasonably tending to support the verdict. See the following cases: *Creek Bank & Trust Co. v. Johnson,* 33 Okla. 696, 127 Pac. 480; *St. Louis & S. F. R. Co. v. Dale,* 36 Okla. 114, 128 Pac. 137; *Hampton v. Culberson,* 29 Okla. 468, 118 Pac. 134; *American W. & P. Co. v. Spear,* 31 Okla. 22, 119 Pac. 586; *Grimes v. Wilson,* 30 Okla. 322, 120 Pac. 294; *Federal Trust Co. v. Spurlock,* 34 Okla. 644, 126 Pac. 805; *Brissey v. Trotter,* 34 Okla. 445, 125 Pac. 1119; *Stringer v. Hart,* 36 Okla. 264, 128 Pac. 135; *T. S. Reed Grocery Co. v. Miller,* 36 Okla. 134, 128 Pac. 271.

The defendant further assigns error in that (third specification) the damages awarded are excessive and "appear ∽o have been given under the influence of passion and prejudice."

Section 7, art. 23* (section 356, Williams' Ann. Ed.), Constitution of Oklahoma reads:

"The right of action to recover damages for injuries resulting in death shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation."

The question of recovery for the pain and suffering of the intestate is neither involved nor claimed in this proceeding. *A., T. & S. F. Ry. Co. v. Rowe,* 56 Kan. 411, 43 Pac. 683; *Farmers' State Bank v. Stephenson et al.,* 23 Okla. 695, 102 Pac. 992; *State ex rel. v. Cullison, Judge,* 31 Okla. 187, 120 Pac. 650. The damages recoverable have reference to a pecuniary loss. *St. Joseph & Western R. Co. v. Wheeler,* 35 Kan. 185, 10 Pac. 461; *A., T. & S. F. Ry. Co. v. Weber,* 33 Kan. 543, 6 Pac. 877, 52 Am. Rep. 543; *C., K. & W. R. Co. v. Bockoven,* 53 Kan. 279, 36 Pac. 322. See, also, *Tilley v. Hudson River R. Co.,* 24 N. Y. 471; *Telfer v. Northern R. Co.,* 30 N. J. Law, 188; *Safford v. Drew,* 10 N. Y. Super. Ct. 627; *Chicago & R. I. R. Co. v. Morris,* 26 Ill. 400; *Ill. Cent. R. Co. v. Weldon,* 52 Ill. 290; *City of Chi-*

cago v. Scholten, 75 Ill. 468; Chicago & N. W. Ry. Co. v. Bayfield, 37 Mich. 205; Kesler v. Smith, 66 N. C. 154; Baltimore & O. R. Co. v. State, Use of Kelly et al., 24 Md. 271; Penn. R. Co. v. McCloskey, 23 Pa. 526; Same v. Vandever, 36 Pa. 298; Same v. Butler, 57 Pa. 335; Same v. Goodman, 62 Pa. 329; Johnston v. Cleveland & T. R. Co., 7 Ohio St. 336, 70 Am. Dec. 75; M. & W. R. Co. v. Johnson, 38 Ga. 409; Rose v. Des Moines Valley R. Co., 39 Iowa, 246; Orgall v. Chicago, B. & Q. R. Co., 46 Neb. 4, 64 N. W. 450; Louisville & N. R. Co. v. Orr, 91 Ala. 548, 8 South. 360; Bertha Geiger v. Worthen & Aldrich Co., 66 N. J. Law, 576, 49 Atl. 918; Donaldson v. Miss. & Mo. R. Co., 18 Iowa, 280, 87 Am. Dec. 391; Nashville & C. R. Co. v. Stevens, 9 Heisk. (Tenn.) 12; Long v. Morrison, 14 Ind. 595, 77 Am. Dec. 72; Malott, Receiver, v. Shimer, Adm'x, 153 Ind. 35, 54 N. E. 101, 74 Am. St. Rep. 278.

In St. Louis, I. M. & S. Ry. Co. v. Freeman, 89 Ark. 326, 116 S. W. 678, it is said:

"It is contended that the verdict is excessive. Plaintiff's decedent was shown to have been 24 years of age, a man of good habits, healthy, intelligent, and industrious. He left no children. The case was therefore stripped of all elements of damage except as to the amount of his probable contributions to those dependent upon him. The evidence tended to show a present earning capacity at the time of his death and contribution to his wife of $900 per annum. It tended to show also, and the jury were warranted in finding, that his earning capacity would probably have been increased—to what extent is a matter of speculation. It is shown that his wages had been increased from time to time, and that he was in line of promotion. According to the annuity tables, placing his contributions at $900 per annum, computing at the rate of 6 per cent. per annum, the recovery should have been for $10,845. Making due allowance for the probable increase in his earning capacity, we are of the opinion that the evidence is insufficient to sustain a verdict for more than $15,000."

See, also, Pulaski Gas Light Co. v. McClintock, 97 Ark. 576, 134 S. W. 1189, 1199, 32 L. R. A. (N. S.) 825; Tillar v. Reynolds, 96 Ark. 358, 131 S. W. 969, 30 L. R. A. (N. S.) 1043; St. Louis, I. M. & S. Ry. v. Raines, 90 Ark. 398, 119 S. W. 665, 17 Ann. Cas. 1; St. Louis & N. A. R. Co. v. Mathis, 76 Ark. 185,

91 S. W. 763, 113 Am. St. Rep. 85; *St. Louis, I. M. & S. Ry. Co. v. Caraway,* 77 Ark. 405, 91 S. W. 749; *St. Louis, I. M. & S. Ry. Co. v. Hitt et al.,* 76 Ark. 227, 88 S. W. 908, 990; *St. Louis, I. M. & S. Ry. Co. v. Sweet,* 60 Ark. 550, 31 S. W. 571.

In *St. Louis, I. M. & S. Ry. Co. v. Freeman, supra,* only the widow survived, and consequently the element of pecuniary damages for the loss to a child could not be considered in sustaining a verdict for $15,000. There the intestate was 24 years of age; here he is 30 years of age.

In 13 Cyc. 375, 376, it is said:

"While the general rule is that the recovery must be confined to strictly pecuniary damages, the jury are not bound to any fixed and precise rules in estimating the amount of damages, * * * but may give compensation for any injuries, proceeding from whatever source, and their discretion in fixing the amount of damages should not be interfered with by the court, unless it has been palpably abused. The rule has been sometimes thus stated: To justify interference by the court with the verdict of the jury, it must appear that some rule of law has been violated, or else that the verdict is so excessive or grossly inadequate as to indicate partiality, passion or prejudice in the minds of the jurors."

In the case at bar the jury were not informed by the evidence or by instructions from the court as to the life expectancy of the plaintiff or her decedent shown by standard mortality tables, and there was no evidence of ancestral long life nor the physical condition of the decedent further than plaintiff's statement that he was in perfect health so far as she knew and was a strong man. The evidence showed that he was an affectionate man to his family; that he spent no money for foolishness, "only for necessary expenses"; that he was very industrious; that it was his custom to take his pay check and give it to plaintiff, who, after paying bills, put the balance in bank. Plaintiff was nearly 24 years old, the child, Hazel Long, was about two years old, and the decedent was a strong, healthy, and sober man 30 years old at the time of his death. During the three years of his marriage with plaintiff, he had earned as high as $160 per month while working for another railroad company, had commenced

work for the defendant about 20 or 21 months before his death at $50 per month, had earned $120 per month as night yard-master for the defendant for an undisclosed length of time, ending about fifteen days before his death, and during the fifteen days or thereabout prior to his death had worked for defendant as foreman of its switch engine crew about an hour less time each day and at a little less than $120 per month; but at time of death had saved only about $200 in money.

The evidence is not entirely satisfactory as to actual financial loss sustained by plaintiff and the child, for whom she also sues; and under the law as already herein announced she could not of course recover more; but, in the light of the authorities just quoted, we cannot say, as a matter of law, that she and the child, during its minority, would not apparently have received from his earnings, if he had lived, enough to justify this verdict, nor that the jury might not properly have found from the evidence that they would have received the same.

The defendant further assigns error in that the court (sixteenth specification) overruled its motion for a new trial; but what has already been said in respect to the other assignments of error is believed to cover every question presented by this one; and we find no reversible error in the action of the court in denying the motion.

It follows that the judgment of the trial court should be affirmed.

By the Court:   It is so ordered.