38   375
44   339
38   375
70   263

38   375
73   557

38   375
f79  813
e79  814

## THE TOPEKA CITY RAILWAY COMPANY v. CHARLES HIGGS.

1. STREET RAILWAY COMPANY — *Duty in Running Cars — Rule.* A street railway company using cars drawn by horses upon rails, and carrying passengers for hire, is bound to exercise all possible skill, foresight and care in the running of its cars, so that passengers may not be exposed to danger on account of the manner in which the cars are run. "All possible skill and care" implies that every reasonable precaution in the management and operation of street cars be used, to prevent injuries to passengers. It means good tracks, safe cars, experienced drivers, careful management and judicious operation in every respect. All possible foresight means more than this; it means anticipation, if not knowledge, that the operation of street cars will result in danger to passengers, and that there must be some action with reference to the future, a provident care to guard against such occurrences, a wise forethought and prudent provision that will avert the threatened evil, if human thought or action can do so.

2. CARRYING PASSENGERS — *Duty of Company — Application of Rule.* This rule applies in this state to all vehicles used to carry passengers for hire, the only difference being in the means and instrumentalities used, (these being adapted to the particular mode of conveyance,) rather than to the degree in which the preventive means are to be applied. To each and every method of carrying passengers for hire must be applied the greatest skill, care and foresight to which they are in their nature susceptible, to avoid liability for injuries occasioned by their operation. The best effort of the minds directing the operation of horse cars must be diligently applied, in devising ways and means to prevent injuries to passengers being carried thereon.

3. FACTS STATED, *Showing Gross Negligence of Company.* When a street railway company undertakes to carry large crowds of people, vastly in excess of the seating capacity of its cars; and permits passengers to ride on the platforms and foot-boards of its cars without objec-

tion, and collects fare from them; stops its cars when in such a crowded condition that no seats are attainable, and permits persons to get upon them to be carried from place to place; and when the cars are in such a crowded condition with passengers riding on the foot-boards, and the employés of the company run the cars so near the intersection of a switch with the main track that the cars on each cannot pass without injury to passengers, the company is guilty of gross negligence.

### Error from Shawnee District Court.

ACTION by *Higgs* against the *Topeka City Railway Company*, to recover damages for bodily injuries received on October 1, 1885, while plaintiff was a passenger on one of the defendant's cars. Trial by a jury, at the April Term, 1886. Among the instructions given the jury, are the following:

"3. Carriers of passengers are bound to exercise all possible skill, foresight and care in the running of their cars, so that passengers may not be exposed to danger on account of the manner in which the cars are run.

"4. If plaintiff got upon defendant's car in company with his cousin, for the purpose of taking passage thereon, and on account of the crowded condition of the car plaintiff was unable to procure a seat, and remained standing on the foot-board of the car without any objection from the conductor or other employé of the company, and while riding at that point he was injured 'by reason of a collision of defendant's cars, then I instruct you that the mere fact that plaintiff was riding upon the foot-board of the car will not exonerate defendant from liability."

"6. If you find from the evidence that it was customary for the defendant, by its employés, during the crowded seasons, to permit passengers to ride upon the foot-boards of the cars, where plaintiff was riding, without objection, collect fare from them the same as when occupying seats inside the cars, and that plaintiff was riding where it was customary to ride when the car was crowded, without any objection from the conductor or other employé of the company, then I instruct you that the mere fact that plaintiff was riding upon the car at that point will not defeat his right to recover."

Among the instructions asked for by defendant, and refused, is the following:

"2. The court instructs the jury that it is the duty of the

defendant to exercise all reasonable precaution and care for the safety of its passengers, but it is also the duty of each and every person while riding on a street car to use ordinary care for his own safety, and reasonable precaution to guard against accidents. And if the jury believe that at the time the plaintiff got aboard of defendant's car, on the afternoon of October 1, 1885, was lame and weak, so that he was not able by reason of said bodily infirmities to use ordinary strength and care to protect himself from accident, and the position on the step of the car was thereby more hazardous to plaintiff, then the act of plaintiff in taking the exposed position on the step of the car was negligence, and he cannot recover in this case."

The jury rendered a verdict for plaintiff for $200, and answered questions of fact submitted by the defendant, as follows:

"1. Was not plaintiff, at the time he got hurt, standing on the outside and side platform of an open car, No. 19, with one arm around a side-standard, and the other holding on to the seat, or if not, how and where was he standing? *Ans.:* Yes.

"2. Was not car No. 19 at a standstill at the time plaintiff got hurt? A. No.

"3. At the time plaintiff got onto car No. 19 for passage, was there not a seat which the plaintiff could have taken? A. No.

"4. Was not plaintiff requested by the superintendent of defendant to not get onto the crowded cars in his crippled condition, but to wait, and he (the superintendent) would get him a seat? A. Yes.

"5. Did not the driver or conductor of car No. 19, after plaintiff got on for passage, at the time of the injury, request the plaintiff to come into the car and take a seat? A. No.

"6. Had not the plaintiff been hurt about September 2, 1885, by falling from the top of the balustrade of the Valley House to the pavement, and did it not at the time he got hurt on the street car require him to use a crutch and cane, and what was the distance of such fall? A. Yes; no; 14 feet 2 inches.

"7. Did not plaintiff, in a crippled condition, using a crutch and cane, go upon car No. 19 for passage, and, of his own motion, knowingly and intentionally stand on the outside side platform, holding on to the post and seat to enable him to stand? A. Yes.

" 8. What was the distance between cars 3 and 19 at the time and place where plaintiff got hurt? A. We cannot arrive at the exact distance.

"9. State what accidents had occurred to the plaintiff, previous to the injury complained of? A. The accident at the Valley House, and the accident when plaintiff's ladder broke and he fell into an apple tree."

New trial denied; judgment on the verdict for the plaintiff. The defendant *Company* brings the case here. The material facts are stated in the opinion.

*Jones & Mason,* and *J. G. Waters,* for plaintiff in error.

*William R. Hazen,* and *Hazen & Isenhart,* for defendant in error.

Opinion by SIMPSON, C.: The defendant in error was a passenger on one of the open cars of the street railway company on the evening of October 1, 1885, at a time when there was a vast concourse of people in the city of Topeka, drawn together by a sham battle on the fair grounds during a soldiers' reunion. The car upon which the defendant in error was riding was going north from the fair grounds along a street known as Topeka avenue. On this street, and between Huntoon and Thirteenth streets, is located alongside of the main track of the street railway, and to the east of it, a switch track, 217 feet long from point to point, used to allow cars to pass. The car upon which defendant in error was riding was what is called an open car; on each side of the frame of the car, extending its whole length, there was a foot-board from 8 to 10 inches wide, to enable passengers to step into and out of the car. And on occasions when there was a large and unusual number of passengers to be carried, these foot-boards were utilized by the company, and passengers were allowed to stand upon them, and to be carried on them from station to station. Higgs was standing on the west foot-board, north of the center of the car and near to its front end, when the car turned onto the switch, went so far north on it and approached so near to its intersection with the main track, that a closed car

coming south on the main track ran so near the open one on which he was riding, that he was squeezed against one of the posts that support the roof of the open car, and was bruised and injured in the shoulders and back.   The jury found in answer to special questions submitted to them, that the open car upon which he was riding at the time the injury occurred was in motion; and there is no question under the evidence but that the closed car going south on the main track was also slowly moving.   It does seem that, considering the vast crowds of people which were being transported by the street railway company, the large number that was on this particular car, every seat being occupied, the front and rear platforms crowded, and many persons standing on both foot-boards, it was gross negligence upon the part of the employés of the railway company to approach so near the intersection of the switch to the main track.   This act of the employés of the company was the direct and immediate cause of the injury inflicted on the defendant in error.   It is among the special findings of the jury, in substance, that the car was so crowded at the time Higgs got upon it that there was no seat which could be occupied by him, and that his only chance was to ride upon the foot-board.   It is in evidence that when large numbers of people were to be carried, the railway company permitted passengers to ride on the foot-boards, and collected fare from them; that on this occasion people vastly in excess of the number of seats contained in such cars were carried, so that there was no contributory negligence on the part of the defendant in error in getting on the foot-board of the car to ride to town, and in standing there, being unable to secure a seat on account of the crowded condition of the car, there not being a vacant seat that he could have taken.   It is sought to establish contributory negligence on the part of the defendant in error, by proof that before this time he was crippled, and on this day was using a crutch and cane; that the superintendent of the street railway company, to whom he was personally known, had noticed that he was using the crutch and cane, and had warned him not to attempt to get on the cars

"while there was such a rush," and promised to get him a seat in the cars; that Higgs waited for more than one hour after that promise, during which time the superintendent states that probably twenty-five cars had started but he had done nothing to secure Higgs a seat.  At the expiration of this time Higgs went north the length of a block, and he and a lady relative whom he was escorting on that day got on the car upon which he was injured, and rode down to the starting-place, hoping by that means to get a seat, but there was only one vacant seat, and that was given to the lady.  As the car · approached the usual stopping-place the crowd congregated there, awaiting an opportunity to get down town, surged on the car as those who had ridden from town were getting off, and occupied the seats as fast as they were vacated.  The special finding is, that there was not a seat which he could have taken.  Then according to the usages and practices of the company on such occasions, he had the right to get upon the foot-board of the car and ride thereon, and in this case it was not an act of negligence on his part.  He was not injured in the act of getting on the car, as the superintendent seemed to be in fear of; this act he had performed safely, but he was injured by the negligence of the employés of the company, who permitted the open car to be placed so near the point of intersection of the switch with the main track that the cars could not pass each other with safety to the passengers.  We cannot see that his use of a cane, and his temporary use of the crutch on that day, relieve the company from the liability caused by this act of gross negligence on its part.  It appears from the evidence that the driver of the car was temporarily employed for the time of the reunion, and was probably inexperienced by want of former employment in this line of work, although the company kept him in its employment after the accident, and up to the time of the trial of the cause.

It is said that he could have seen the car coming on the main track, and avoided the injury by the exercise of ordinary caution.  This is a dangerous assumption for the plaintiff in error; it is virtually saying that the use of his eyes ought to

have made it apparent that the company was about to commit an act of gross negligence; but, as he says he did not see the car until a moment before the injury occurred, we would much rather assume for the sake of the employés on both cars, that the risk was not so imminent as to be seen and apprehended by the passengers. As a matter of fact, he did not see the danger until it was too late to avoid it. He was not guilty of contributory negligence in respect to any of the acts and matters alleged.

It must be held, that when a street railway company undertakes to carry large numbers of people, vastly in excess of the seating capacity of its cars, and permits passengers to ride

3. Gross negligence of company. on the platforms and foot-boards, without objection, and collects fare from them, and stops its cars when in such a crowded condition that no seats are attainable, and permits persons to get upon them to be carried from place to place, and when the cars are in such a crowded condition, with passengers riding on the foot-boards, runs them so near the intersection of a switch with the main track that they cannot pass without injury to passengers, the company is guilty of gross negligence.

There is a very vigorous criticism of some instructions given, and of the refusal to give others, as requested by the plaintiff in error, but the important question to be solved is presented by the third instruction given, to wit: " Carriers of passengers are bound to exercise *all possible skill, foresight and care* in the running of their cars, so that passengers may not be exposed to danger on account of the manner in which the cars are run." It is said that this places the degree of care required of a street railway company too high, and hence it was error. Admitting that this instruction does hold the street railway company to a too strict rule of diligence, and yet, as we view the evidence on the whole record, we would still hesitate to reverse the case. We doubt whether it would have been error in the trial court to have instructed the jury, as a matter of law, that the plaintiff was guilty of gross negligence in running its cars, for several reasons: First, the ques-

tion of negligence in this case is to be determined very largely by the character of the act, and not by the character for care and caution which the street railway company may sustain, or by the care and caution it was trying to exercise generally on this particular occasion. The negligence complained of here was the commission of such an act, to wit, the placing of the car on the switch so near the point of intersection with the main track that the most ordinary mind could see that injury would follow to those standing on the foot-boards. It seems that the evidence offered by the street railway company aggravates, rather than excuses, the negligence. It is in substance that there was another car going north, and following the one the injury occurred on, and that it was necessary to drive the first so far north on the switch as to allow the one that was following, room on the switch to pass the southbound car on the main track. This is a demonstration that the switch was not properly constructed, that it was too short, or that it was intended for only one car, and ought not to have been used by both cars going north. In either case, it shows negligence on the part of the company. The superintendent of the company testified that the length of the switch was 217 feet from point to point; that from the north point of the switch running south, the radius of increase of the width between the switch and main track for the first forty feet is one inch to the foot; for the next twenty or thirty feet there is not so much increase, as it then approaches a straight line parallel with the main track; that the cars could pass each other and not touch, when the front end of the car on the switch was twenty-six feet from the point where the switch left the main track. It is from 70 to 72 feet from the points of intersection where the switch commences to curve in for the purpose of running on the main track. This leaves a length of switch with an equal distance from the main track of 48 feet, the distance from the main track being not quite two feet. A person riding on the foot-board would be perfectly safe at any point on the switch until after it curves toward the main track. The skill, care and precaution of drivers, conductors

and the superintendent generally amount to nothing, in view
of the plain fact that this car was driven too far north on the
switch.   It was this act, in this particular case, that was the
direct and immediate cause of the injury.   The defendant in
error had a right to presume due care on the part of the rail-
way company.   He was riding on the car in a position al-
lowed to be occupied by other passengers on like occasions;
he had no control over the employés of the company, and no
knowledge of the switch, or that the company was using it
beyond its safe and reasonable capacity, but he had the un-
doubted right to rely on the exercise of ordinary prudence by
the street railway company, both as to the use of the switch
and the management of its cars in the act of passing each
other, when one or both were crowded with passengers.   The
fact that the cars, both in motion, came so near each other in
the act of passing that the injured man was pressed by them,
squeezed in between them, is not in dispute.   Hence we say,
that if the court below had charged the jury, as a matter of
law, that this was gross negligence on the part of the street
railway company, we would hesitate to say that it was error
but as that was not done, we will consider the instruction, and
determine whether or not it stated the rule of diligence.   Cars
drawn by horses upon rails are in the main governed by the
same rules as other vehicles. (Shearman & Redfield on Neg-
ligence, 3d ed., 312.)   In an action to recover damages for
personal damages sustained as a passenger in a stage coach,
the court has approved an instruction which stated that "a
stage-coach proprietor who carries passengers for hire is re-
sponsible for all accidents and injuries happening to passengers,
which might have been prevented by human care and fore-
sight." (*Sawyer v. Sauer*, 10 Kas. 466.)   So that the only
objection to the instruction given in this case results from the
use of the word "possible," and it means "liable to happen
or come to pass;" "capable of existing, or of being conceived
or thought of;" "capable of being done;" "not contrary to
the nature of things." (Webster's Dictionary.)   "All possible

skill and care" implies that every reasonable pre-caution in the management and operation of street cars be used to prevent injuries to passengers; it means good tracks, safe cars, experienced drivers, careful management, and judicious operation in every respect. All possible foresight means more than this; it means anticipation, if not knowledge, that the operation of street cars will result in danger to passengers, and that there must be some action with reference to the future, a provident care to guard against such occurrences, a wise forethought and prudent provision that will avert the threatened evil, if human thought or action can do so. Is it possible that the thought never occurred to any one of the persons operating this street railway that a car on the main track and one on the switch could run so close together that they would collide, or that some one might be injured by their proximity? The instruction as applied to the particular facts of this case is not objectionable; its phraseology may not be felicitous, but it does not practically require any greater or higher degree of care than if the expression used had been "the highest" or "the utmost," and these are frequently found in the reported cases.

The case of *Tuller v. Talbot*, 23 Ill. 357, cited by plaintiff in error, is a case of injury by a stage coach, and the court says: "Common carriers of persons are required to do all that human care, vigilance and foresight reasonably can under the circumstances, in view of the character and mode of conveyance adopted, to prevent accident to passengers." All that human care can do is the "highest," "utmost," "possible" effort.

The case of *Meier v. Pa. Railroad Co.*, 64 Pa. St. 226, is one in which a passenger in a sleeping-car was injured by the axle of the forward truck of the car breaking, by reason of a latent defect in its construction, not discernible by those who were skilled in such matters, and has no application here, the facts being entirely different; and yet the court says in that case: "The carrier may relieve himself, by showing that the

injury arose from an accident which the utmost skill, foresight and diligence could not prevent."

The supreme court of the United States, in its opinion in the case of *P. & R. Rld. Co. v. Derby*, 55 U. S. 468, says:

"When carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and public safety require that they be held to the greatest *possible care and diligence.*"

In that case it was the greatest *possible care and diligence in the management of steam cars; in this case it is all possible skill, foresight and care in the use of horse cars.* Both of these expressions are used with reference to the character and modes of conveyance adopted in either case. They are similar in meaning and in legal effect, and yet are not to be understood to require that the same preventive measures or wise precautions which are taken by those directing the operation of steam cars, must be taken by those in charge of horse cars, but they do mean that the best effort of the minds directing the operation and supervising the management of steam cars and of horse cars, shall be diligently applied in devising ways and means to prevent injuries to passengers being carried thereon. Steam cars may require greater care in their management and greater caution in their operation, but the passengers are entitled to the highest possible degree of each; so those riding on street cars have the legal right to insist that they shall be managed and operated with all possible skill, care and foresight, which in their nature they are capable of.

The theory of counsel for the plaintiff in error seems to be that the rule of highest skill can only be applied to cars propelled by steam, because it is the most dangerous of all modes of conveyance. We think that the rule applies to street cars and other vehicles drawn by horses, to its full extent, the difference being in the means and instrumentalities used to prevent accident by reason of the mode, rather than to the degree in which the preventive means are to be employed. To each

25 — 38 KAS.

must be applied the greatest degree of skill, care and foresight of which they are susceptible, to avoid liability for injuries occasioned in their operation. We think there is no error in the instructions given, and no error in refusing the instructions asked for.

Objection is made to instructions four and six, wherein the court instructs the jury that the mere fact that the plaintiff Higgs was riding on the step of the car would not defeat his right to recover, if it was customary to ride there and the car was so crowded he could not procure a seat, and if he rode there without objection from the conductor or other employé of the company; and it is said they were clearly wrong because there was no evidence of any permission to ride on the step, and because the evidence was undisputed that the plaintiff Higgs had been distinctly warned against riding there; and the case of *Huelsenkamp v. Rly. Co.*, 34 Mo. 45, is cited and claimed to be decisive of this question. What are the facts as developed by the witnesses produced by the plaintiff in error? The superintendent said: "I said to Higgs, don't try to get on the cars while there is such a rush; as soon as I can, I will get you a seat;" but he never did anything more than talk to him; made no effort to furnish a seat. It is not in terms a warning not to ride on the foot-board; it is an expression of fear that, as he was crippled, he might get hurt in the rush, coupled with a promise to get him a seat. He did not get hurt in the "rush," and he did not get a seat. The superintendent also stated that at the reunion it was customary for persons to ride on the foot-boards, on the platform of the cars, and even on the top of the cars, and that the conductors collected fare from them wherever they rode, but they were requested not to so ride by him; that on all cars that started after he had promised Higgs to get him a seat, persons were riding on the foot-boards; that upon all the cars coming to and going from the city, the company allowed men, women and children to continuously ride upon the front platform, the rear platform, and also upon the foot-boards of the cars, and collected fare from them; that fare was collected from

men riding on the top of the cars the same as if they had ridden on the inside of the cars; that the seating capacity of an open car is twenty-five persons, and it carried from that number to eighty persons; that it stopped to receive passengers and allowed them to get on, long after the seats were all occupied; that fare was collected if they got on the car, without reference to whether they had a seat or not. The conductor of the car said that it was a fact that passengers continuously rode on the foot-boards, and sometimes on the top of the cars, and he collected fare from them. These citations from the evidence in the record abundantly establish the proposition that on this occasion the defendant in error had permission to ride on the foot-boards, and had not been distinctly warned against riding there. These facts justify the instructions complained of. The case cited was reversed, because no such permission was proved or shown on the trial below; here it was shown conclusively, by the witnesses of the plaintiff in error, that the usage and practice, whenever there was a large crowd to be accommodated, was for men, women and children to continuously ride on the foot-boards, and that fare was always collected from them.

The second instruction asked by the street railway company was properly refused, because it did not state the rule of diligence and care required by such company in the operation of its road and the management of its cars.

The answer to special question No. 4, submitted to the jury, must be construed in the light of the evidence respecting the subject-matter of the interrogatory. In the view of counsel for plaintiff in error, a person in a crippled condition has no right to ride on a street car under any circumstances, except when a seat is furnished by some employé of the company. It is unquestioned that the company can make all such rules respecting the manner in getting off or on the cars; the place where passengers are to ride; and every other reasonable regulation that conduces to the safety and accommodation of the persons to be carried over its line, and has the undoubted right to insist on their due observance; but having done so,

the company must not be the first to violate them or depart from their requirements, so that if it is permitting men, women and children, on public occasions, when there is a large number of persons to be carried, to ride on the foot-boards of its cars, it cannot relieve itself of liability for an injury to a person on the foot-board by a warning and a promise of a seat. The defendant in error had the same right to ride on the foot-board of the car as any other passenger whom they carried on that day. If, on account of his crippled condition, he had been injured by people rushing to get on or off the cars of the company, of course no liability would attach to the company on account of such an injury. His crippled condition did not change his rights or vary the duties and obligations of the company as a carrier of passengers, in any respect, except that he was entitled to a longer time in which to get on or off the cars than a passenger who was not crippled or infirm. He was not injured by reason of his crippled condition, nor is there any evidence which shows that such condition either directly or indirectly contributed in any manner to the injury.

It is also insisted in this connection, that the position taken knowingly and intentionally by the defendant in error, is negligence *per se*, and for that reason the company is not liable. While we have substantially disposed of this objection, in what we have said on another branch of the case, it is well to reinforce that view by citations from a few well-considered cases. In *Germantown Rly. Co. v. Walling*, 97 Pa. St. 55:

"The passenger voluntarily got upon a car so crowded that he was obliged to take a position on the step of the front platform of the car, occupied at the time by two other men, between whom he squeezed into a position, where, for the purpose of retaining his place, he was obliged to hold fast with one hand to the dasher, and with the other to the iron bar under the window of the car. The car stopped when he hailed it, and received him as a passenger. The driver testifies that he knew the car was so full a man could not go through it to the rear platform. Crowded as it was, the conductor said there was room for more, both inside and on the rear platform, but Walling first tried to get on the rear platform, and failing, went to the front. Conductor, driver and passengers acted as if

there was room so long as a man could find rest for his feet, and a place to hold on with his hands. The companies do not consider such practices dangerous, for they knowingly suffer it, and are parties to it. Their cars stop for passengers when none but experienced conductors see a footing inside or out. Street railway companies have all along considered their platforms a place of safety, and so have the public. Shall the court say that riding on a platform is so dangerous that one who pays for standing there can recover nothing for an injury arising from the company's default? So little danger exists in riding on platforms, accidents to passengers while thus riding are so rare, that this is the first time the question raised has been presented in Pennsylvania."

In *Meesel v. L. & B. Rld. Co.*, 8 Allen, 234, the court said:

"The seats inside are not the only places where the managers expect passengers to remain, but it is notorious that they stop habitually to receive passengers to stand inside till the car is full, and continue to stop and receive them even after there is no place to stand except on the steps of the platforms. Neither the officers of these corporations, nor the managers of the cars, nor the traveling public, seem to regard this practice as hazardous, nor does experience thus far seem to require that it should be restrained on account of the danger. There is therefore no basis upon which the court can decide, upon the evidence reported, that the plaintiff did not use ordinary care."

The facts in this case were very similar to the one cited from Pennsylvania. Standing on the front platform of a horse car when there is room inside, is not conclusive evidence that the person injured by the driver's default was not exercising due care. (*Maguire v. Middlesex Rld. Co.*, 115 Mass. 239.)

A street railway company has the right to carry passengers on the platforms, and if a passenger be injured while standing there, without objection by the company's agent, whether the injury was with his contributory negligence is for the jury to decide under all the facts and circumstances detailed in the evidence. (*Burns v. Bellefontaine Rly. Co.*, 50 Mo. 139.) It has also been decided in other states, that if a passenger be injured while standing on the platform of a street or horse car,

the question of his contributory negligence is one of fact for the jury.

In *Nolan v. B. C. & N. Rld. Co.*, a very recent case decided by the New York court of appeals, 87 N. Y. 63: "The plaintiff, a passenger on a street car, rode on the front platform, without warning or notice to the contrary, for the purpose of smoking.    There was plenty of room inside, but the conductor took his fare without comment."    Being thrown off and injured by a violent and negligent jolt, it was held that he was not debarred from recovery by occupying the platform.    It seems from these cases, that there could be no pretense for saying, under the particular facts of this case, that the defendant in error was negligent *per se.*

There is nothing in the other exceptions which would justify a reversal.

It is recommended that the judgment be affirmed.

By the Court: It is so ordered.

All the Justices concurring.