## SAND SPRINGS R. CO. v. SMITH.

No. 10357—Opinion Filed Nov. 15, 1921.

Rehearing Denied Jan. 10, 1922.

(Syllabus.)

**1. Carriers—Overloaded Passenger Cars—Negligence.**

While it cannot be declared negligence as a matter of law for a street railway company to allow its cars to be crowded with passengers, yet if the company permits its cars to become so crowded that a passenger, while standing upon the platform of a car, receives injuries when the car collides with another car of the defendant, the question of whether the overcrowding of the cars is negligence is one of fact for the jury.

**2. Same—Contributory Negligence.**

The mere fact that a person rides on a crowded car or the platform of such a car on the invitation of a railway company, cannot be regarded as contributory negligence per se.

**3. Same—Care Required.**

One who rides on a crowded car assumes the inconvenience resulting from its crowded condition, but the company is not for that reason relieved from the responsibility of using due care for the safety of the passengers invited upon such crowded cars.

**4. Same—Injury to Passenger—Contributory Negligence—Question for Jury.**

Whether a person who enters a car of a street railway company which is already crowded and rides on a crowded platform, from which he is injured, is guilty of contributory negligence is a question to be determined by the jury under all the circumstances brought out in the evidence.

**5. Appeal and Error—Review—Questions of Fact—Verdict.**

In a civil action, triable to the jury, where there is competent evidence reasonably tending to support the verdict of the jury, and no prejudicial errors of law are shown in the instructions of the court or its ruling on law questions presented during the trial, the verdict and finding of the jury will not be disturbed on appeal.

**6. Carriers—Injury to Passenger on Crowded Street Car—Judgment—Affirmance.**

Record examined, and held, that there was no reversible error in the record, and ordered that the judgment of the trial court be affirmed.

Error from Supreme Court, Tulsa County; M. A. Breckenridge, Judge.

Action by Roy Smith against the Sand Springs Railway Company for damages for personal injuries. Judgment for plaintiff, and defendant brings error. Affirmed.

Stuart, Cruce & Riddle, H. O. Bland, Paul P. Pinkerton, and E. J. Doerner, for plaintiff in error.

Walker, Underwood & Rodolf, for defendant in error.

JOHNSON, J. This is an appeal from the superior court of Tulsa county.

On the 5th day of May, 1913, Roy Smith, by his father and next friend, W. B. Smith, commenced an action in the superior court of Tulsa county against the Sand Springs Interurban Railway Company, as defendant, to recover damages and for alleged personal injuries received by the said Roy Smith on the evening of July 4, 1912, while a passenger on one of defendant's trolley cars.

Before the case was tried below, Roy Smith attained his majority and was, by the court, substituted as plaintiff in his own right, and on the 6th day of December, 1917, the case was tried to the court and jury, and resulted in a verdict and a judgment thereon in favor of the said plaintiff in the sum of $3,000, to reverse which judgment this proceeding in error was commenced.

For convenience, the parties will hereinafter be referred to as plaintiff and defendant, respectively, as they appeared in the trial court.

The pleadings of the parties are quite voluminous, a brief summary of which is substantially as follows:

The plaintiff alleged, in substance, that the defendant was a corporation, and was at all times thereinafter mentioned engaged in the operation of a line of interurban railway between the city of Tulsa and Sand Springs, being about six miles west and northwest of Tulsa; that said defendant ran and operated both gasoline and electric cars over and upon said line of road between Tulsa and Sand Springs for the purpose of transporting and carrying passengers; that on the 4th day of July, 1912, the said defendant was operating said railway as aforesaid, and running both gasoline and electric cars over said line and carrying passengers for cash fares; that on said date, about nine o'clock p. m., said defendant received plaintiff on one of its said electric cars, which was being run by means of electricity from a wire overhead, and said plaintiff had paid his cash fare to the city of Tulsa; that said defendant agreed and undertook to safely transport and carry said plaintiff from Sand Springs to Tulsa over its line; that shortly before said electric car upon which plaintiff was riding left the station of Sand Springs one

of the gasoline cars of said defendant, which was being used on said date to carry passengers over said line, left said station with many passengers for Tulsa; that said gasoline car had not proceeded very far from Sand Springs when on account of the defective condition of the engine and machinery with which said car was being run said car stopped on the track of the defendant company; that it was a dark night and the agents and servants of the defendant company negligently failed and neglected to put up any danger signals or lights or send anyone back on the track of said defendant company to notify the agents and servants of said company who were running and operating the electric car upon which this plaintiff was riding, of the danger ahead; that the electric car upon which this plaintiff was riding, being very heavily loaded and running at full speed, was proceeding in an easterly or southeasterly direction on said railway line between Sand Springs and the city of Tulsa when the said electric car collided with and ran into the gasoline car standing on the track of the said defendant, as aforesaid; that the electric car crashed into said gasoline car with great force, tearing off the front end of said electric car, and that by reason of said collision this plaintiff was knocked down and thrown forward and out of the front end of said car with great force and violence, and was bruised, mangled, wounded, and rendered unconscious; that said electric car was being run and operated by the agents and servants of the said defendant in a careless and negligent manner; that the operators of said car were green, unskilled, and inexperienced men in the running of electric cars; that the brakes and appliances of said electric car, the technical names of which were unknown to said plaintiff, by which said car was operated were defective and out of order and failed to work, and that if said car had been in proper repair and operated by capable and competent men, said car could have been stopped and said accident avoided; that the plaintiff received in said collision permanent and lasting injuries as follows: His right ankle was badly sprained and wrenched; both hands bruised and skinned; forehead badly cut and gashed; skull badly fractured and thrust in; that all of said injuries were caused by the negligence, mismanagement, and want of care of the servants, agents, and employes of said defendant, and negligent management and control of said gasoline car and said electric car which were being run by them, and particularly the electric car upon which

this plaintiff was riding on said date; that the plaintiff was without fault in the premises.

Plaintiff further states that the cut and gash upon his forehead has left a permanent scar which has disfigured him permanently, and that the fracture of the skull, as above described, has permanently injured him; that by reason thereof he has suffered and still suffers great and excruciating bodily pain and has undergone great mental suffering and worry; that he has been unable to study or attend school since said injury; that by reason of the above and foregoing injuries, all of which were caused by the negligence and incompetency of the agents and servants of said defendant, this plaintiff has been injured in the sum of $5,000.

The defendant answered, admitting that it was a corporation and engaged in operating a railroad as alleged by the plaintiff, but denied generally and specifically the negligence charged by the plaintiff, and alleged that if the plaintiff was injured, it was due to his own negligence, and specifically set out such alleged contributory negligence on the part of the plaintiff, which was, in substance, that at the time the plaintiff boarded a car of the defendant he and others, consisting of a vast multitude of people, made a rush for said car and overloaded the same against the protest of the servants of the defendant in charge of said car, insomuch so that such servants were not afforded room to work and operate said car, and that the plaintiff voluntarily assumed a dangerous position on said car, on the front platform or vestibule thereof, knowing that such position was dangerous and hazardous, and that by reason of his conduct assumed an extra hazardous risk by reason of his said position on said car.

To the answer of the defendant the plaintiff filed a reply consisting of a general denial.

The issues thus formed by the pleadings consisted of a charge by the plaintiff of primary negligence on the part of the defendant, and as a direct and proximate result thereof the plaintiff received the injuries complained of; and in answer to which the defendant denied such charge of primary negligence and alleged contributory negligence of the plaintiff which resulted in his injuries, which charge of contributory negligence the plaintiff denied.

The undisputed evidence showed, in substance, that on July 4, 1912, the date of the injury, there was a picnic at Sand Springs

Park, and that an immense gathering of people had assembled there on that date, and that shortly after nine o'clock p. m. the plaintiff, with a companion, Floyd Riggs by name, with the vast throng of people boarded the defendant's trolley car No. 25, for the purpose of returning to Tulsa, and that a multitude of persons attempted to board said car, and a sufficient number thereof boarded and loaded said car to its fullest capacity, both inside and out, got upon the same and the car thus loaded, started, and after proceeding a short distance it reached the summit of what was a long steep grade, and that the motorman and conductor lost control of said car, and by reason thereof the car ran away, during which time it attained a rapid rate of speed, a number of witnesses testifying to from 25 to 35 miles an hour, and that at a distance of some three-quarters of a mile ran into the rear of another one of the defendant's cars which was designated as a gasoline motor car, which was much heavier than the trolley car; said collision resulting in killing and injuring a number of persons, and the plaintiff being among the latter.

The plaintiff testified in his own behalf that when he boarded the car the interior of the car proper was crowded so that he could not get in; that he stepped upon the front platform, to the rear of the motorman, and at that time some four or five others were upon the platform, and that others continued to get upon the platform until it became also greatly crowded, but that the employes in charge of the car made no protest against his boarding the same, nor the others that immediately followed, or that he or they get off the car before the same started.

The plaintiff testified to the fact of the two cars colliding, but that he did not remember anything else that happened until about 3 or 4 o'clock the next morning, when he regained consciousness and was near or about his father's home, several miles from the scene of the accident, and was riding in an automobile with his companion, Floyd Riggs, and another, who took him home.

He further testified to the character of his injuries, which consisted practically as alleged in his petition, and introduced other witnesses, consisting of his father and mother and a doctor, Frank Riggs, and others, as to the nature and extent of his injuries; his witnesses testifying that at the time of the injury he was a school boy about 16 years of age, and that when school opened in September after the date of the injury he attempted to attend school, but that on account of his injuries he continually suffered severe headaches and by reason of same could not study, and that such trouble continued, so much so that he had never thereafter been able to attend school and pursue his studies, all of which was corroborated by the testimony of his father and mother, and that at the time of the trial, five years after the injury, he continued to have headaches from time to time as a result of such injury.

As to the cause of the runaway of the trolley car, the testimony was in conflict. The plaintiff testified that when it was apparent that the car was running away the motorman kept turning his brake wheel violently, and that the brake did not work, and that he hollered back to the conductor that his brake wouldn't work, and for the conductor to put on his hand brake. Other witnesses testified for the plaintiff, corroborating his testimony in that respect, one of whom was Judge J. A. Oliphant, who testified in substance that soon after the car started, his wife called his attention to the fact that the car was running very fast; that he asked the conductor, "why the devil he didn't stop the car," and that the conductor replied that the brakes wouldn't work; that the car continued to get faster until everybody became excited and were hollering, most of the passengers on the car were up hollering about stopping the car or it would be running off; that the car continued to get faster; that it was going at least 30 miles an hour; that if it slowed up any before the accident, he didn't realize it. Soon after the car started out, he testified, he saw the conductor at the front end of the car collecting fares, and when it got to going so fast he saw him run up to the motorman and start back, and Frank Gree and he were trying to get them to put on the brakes at both ends, and that he went to the conductor and asked him why he didn't put on the brakes, and he said the brakes would not work, and then the wreck came; that when the wreck came he fell to the middle of the floor and a great many people fell on him.

R. B. Warren, a witness for the plaintiff, testified concerning the runaway, which testimony was about the same as that of Judge Oliphant.

A Mr. Markham testified for the plaintiff that he went out to Sand Springs on the night of the 4th of July, 1912, and went on the electric car in question; that the crowd rushed on the electric car so that when he got to Sand Springs he could not

get off, but kept his seat; that it was the same car that was in the wreck; that he noticed in going out that the motorman did not have control of the car, and that he heard the motorman and conductor talking about it, and that they said that the car was out of order; that the witness knew something was wrong with the car and noticed it right away after the )car left Sand Springs; that Judge Oliphant spoke to him first about the way the car was running; that he heard the conductor holler back to the motorman: that the motorman seemed to be powerless to control the car; that he, witness, was sitting down on the seat and braced himself when the crash came; that they had trouble working the brakes on the car when they went out, and that the car was going about 25 miles per hour at the time of the accident.

B. E. Capps testified for the plaintiff that he was returning on the motor car that was struck by the trolley car; that the motor car had stopped and there was no station there; did not know what it stopped for; he saw the conductor of the motor car get off the car; that he could not say how long the car had been standing there at the time of the accident; he would say five minutes, though, or more; didn't know how much more.

Floyd Riggs, the companion of the plaintiff, testified that he did not go inside of the trolley car, but that he stood on the rail around the vestibule; that he saw Roy Smith, the plaintiff, standing just inside the vestibule; that he was in reach of him, just a rail between them; that he was in reach of the motorman, near enough to reach him with his hand; that the motor car had stopped, and that the brake refused to work on the electric car on which he was riding; that the car was crowded; that the electric car ran into the motor car while the motor car was standing on the track; that he saw they were going to strike and he jumped off about 200 feet before they struck; that he rolled over several times on the ground, but did not receive any injury; that he did not hear the motorman or conductor of the electric car say anything to anyone about getting off of the car when they left Sand Springs; that the electric car was running about 35 miles an hour at the time of the injury, and that it did not slow down any; that he heard the motorman tell the conductor to put on the hand brakes; that the motorman shut off his motor before the collision, that after the collision he found Roy Smith lying outside on the ground; that he was unconscious; that he was bloody all over, his

head was cut to the skull, and he had scars and gashes on the body; his forehead was cut and skull crushed in on top of his head about two inches the size of a lead pencil, and his ankle was sprained, that he washed him in cold water and put him in someone's automobile and brought him to the hospital; arrived at the hospital about one o'clock; that a physician dressed Roy's wounds, and that he took him to his home at Teneha; arrived there about three o'cock the next morning.

H. T. Morrison testified for the defendant that he was the superintendent of the Sand Springs railway and looked after the cars and trainmen; had been in the railway business for 25 years; that the cars and equipment of the defendant were in perfect condition; he understood electric cars; that electric No. 25 was examined by the inspector, who reported it in perfect condition; the inspector's name was Jack Calahan; he only knew the condition of the car from Calahan's card; that the defendant's equipment was of the best, latest and most improved, practically new; that the crew in charge of the cars of the defendant were experienced men and competent. On cross-examination he was asked:

"Q. You know why that motor car was standing on the track there in the dark? A. Well, the fellow, I understood, stopped the car; the conductor had went up to his house. Q. The man that was running the motor car left his car standing on the track and went up to his house? A. Well, the conductor. Q. The conductor or engineer whichever it is, couldn't move that car until the conductor came back from his house? A. Well, he could have moved that. Q. Well, he was—he wouldn't move it without instructions of the conductor. That car was under the management and the supervision of the conductor in charge and he got off and went up to his house and left it standing there on the track and your investigation now of this accident as the manager of this road, did you learn whether or not he put out any signals to warn the car that was coming behind him? A. No. Q. 'Did you ask about that? A. No, I didn't. Yes, I asked about it. * * * Q. Did you make any investigation as the superintendent of that railroad to find out why the men running that electric car into this—and on toward this motor car and it had a headlight on it, why he didn't stop his electric car? A. Well, he claimed the car was running away. I don't know why he didn't stop it. * * * Q. That was what your investigation showed? Well, how did it happen that it ran away, how did it get from under his control? A. I don't know how it got from under his control."

The conductor of the motor car denied that he stopped the car and left the same and went to his house, and testified that

he was on the car ringing up fares and that the same was in motion when the crash or collision came. The motorman in charge of the electric car testified that his brakes were all right, in working order, but that the crowd of passengers crowding him up against the brakes so that he could not operate the same was the reason that the car ran away. The conductor of the electric car testified that the brakes were all right and that the cause of the runaway was that the crowd crowded the motorman so that he could not operate the brakes and control. He also testified that he forbade passengers getting on the car that crowded the same and tried to prevent their so doing, but was unable to control the crowd, and that the crowded condition of the car was the cause of the runaway, and not a defect of the appliances.

The defendant filed a timely motion for a new trial, which was overruled by the court.

The defendant's assignments of error are as follows:

"1. That the court erred in overruling the motion for new trial and in overruling each ground thereof filed by said plaintiff in error.

"2. That the verdict of the jury and judgment of the court is contrary to the evidence.

"3. That the verdict and judgment of the court is contrary to law

"4. Error of law occurring at the trial and duly excepted to by the plaintiff in error.

"5. Error of the court in its charge to the jury and in giving to the jury paragraphs and instructions numbered 3, 5, 8, 9, 10, 11, 12, 13, 14, 15 and 16, to which action of the court the plaintiff in error duly excepted.

"6. Misconduct of the jury as is more particularly set out in paragraphs 31 and 32 of the motion for new trial herein.

"7. That it is shown that said verdict of the jury was rendered under passion and prejudice, as more particularly set out in paragraphs 33 of motion for a new trial, and as is shown from the affidavits of L. M. Poe, H. B. DeLongy and Peter J. Joyce, filed in support of said motion for new trial.

"8. Error of the court in refusing to instruct the jury as requested by the defendant in writing.

"9. That the verdict of the jury and judgment of the court thereon is excessive."

It seems quite clear to us from an examination of the entire record that the same presents a clear case for the jury upon the question of the primary negligence of the defendant, and that of contributory negligence of the plaintiff, and it is clear that the trial court properly overruled the defendant's demurrer to the evidence of the plaintiff.

We have carefully examined the instructions of the court complained of by the defendant, and find that the same submitted the cause to the jury upon these issues quite clearly, and that the instructions as a whole and considered together are remarkably free from error.

The defendant's counsel say that paragraph 12 of the court's instructions was erroneous, in that it took from the jury, in effect, the question of contributory negligence of the plaintiff, and stated to the jury as a matter of law that the plaintiff was not guilty of contributory negligence at the time of the accident. We cannot agree with counsel in the construction that they place upon this paragraph of the court's instructions. In the first part of the instruction the court sums up the situation that the plaintiff was in, as shown by the undisputed facts in the case, and states the duty of the defendant to him as a passenger, and then states to the jury:

"You are instructed that it was not contributory negligence as a matter of law for him to occupy a place and be seated upon the platform when the cars were full, in the position in which a person exercising ordinary care would be safe if the car was run in a safe manner."

This is undoubtedly a correct statement of the law, for the reason that the question of contributory negligence of the plaintiff is always a question of fact for the jury, and is made so by the Constitution of this state. Section 6 of art. 23, Williams' Constitution, is as follows:

"The defense of contributory negligence or of assumption of risk shall in all cases whatsoever be a question of fact, and shall, at all times, be left to the jury."

This court has passed on this question in a number of cases. The duty of the court with respect to instructing the jury on the issue of assumption of risk and contributory negligence is very clearly set forth by Mr. Justice Hardy in the case of Wichita Falls & N. W. Ry. Co. v. Woodman, 64 Okla. 326, 168 Pac. 209. In the opinion, Mr. Justice Hardy lays down the rule as follows:

"This defense (assumption of risk and contributory negligence) under the Constitution is a question of fact for the jury, and the court should not invade the province of the jury by instructing them that a certain fact or circumstance or a given set of facts or circumstances do or do not constitute contributory negligence.

The court should simply define the meaning of the term 'contributory negligence' as used in section 6, art. 23, Williams' Constitution, and leave it to the jury to say whether the plaintiff's negligence had or had not contributed to the injuries complained of." C., R. I. & P. Ry. Co. v. Duran, 38 Okla. 719, 134 Pac. 867; Osage Coal & Mining Co. v. Sperra, 42 Okla. 726, 142 Pac. 1040; St. L. & S. F. R. Co. v. Long, 41 Okla. 177, 137 Pac. 1156; St. L. & S. F. R. Co. v. Hart, 45 Okla. 659, 146 Pac. 436.

Such has been the holding of the courts of last resort in other jurisdictions. In a case the facts of which were similar to the facts in the case at bar, Detlof Lobner v. Metropolitan St. Ry. Co., 79 Kan. 811, 101 Pac. 463, it was held by the Supreme Court of Kansas in the syllabus as follows:

"1. While it cannot be declared negligence as a matter of law for a street railway company to allow its cars to be crowded with passengers, yet if the company permits its cars to become so crowded that a passenger is pushed off and injured, the question of whether the overcrowding of the cars is negligence is one of fact for the jury.

"2. The mere fact that a person rides on a crowded car or the platform of such a car on the invitation of a railway company, cannot be regarded as contributory negligence.

"3. One who rides on a crowded car assumes the inconvenience resulting from its crowded condition, but the company is not for that reason relieved from the responsibility of using due care for the safety of the passengers invited upon such crowded car.

"4. Whether a person who enters a car of a street railway company which is already crowded and rides on a crowded platform, from which he is shoved off and injured, is guilty of contributory negligence, is a question to be determined by the jury under all the circumstances brought out in the evidence"

—citing a long list of cases in support thereof; and that court, in the case of Topeka City Railway Company v. Higgs, 38 Kan. 375, 16 Pac. 667, 5 Am. St. Rep. 754, said:

"A street railway company has the right to carry passengers on the platform, and if a passenger be injured while standing there, without objection of the company's agent, whether the injury was with his contributory negligence is for the jury to decide under all the facts and circumstances detailed in the evidence."

In Lynn v. Southern Pac. Ry. Co., 103 Cal. 7, 36 Pac. 1018, the question whether a passenger was justified in entering a crowded train was under consideration, and the court held that since he was accepted as a passenger, he was entitled to the same care and consideration as other passengers at the hands of the railway company. It was said:

"The fact that he was compelled to stand upon the platform, and was thus more unfortunate and more inconvenienced than his friends who were more able to crowd within the car, was wholly immaterial. Their legal rights were the same. The duties and obligations of the defendant to them were the same."

Many other decisions of this court may be cited in support of the rule announced, but counsel for defendant do not controvert this rule. They base their contention entirely upon the construction they placed upon paragraph 12 of the court's instructions to the jury, and, as we have said, we think such construction is erroneous, especially so when considered in connection with paragraph 13 of the court's instructions, which is as follows:

"You are instructed that it is for your determination in this case, from all the surrounding facts and circumstances in evidence, whether or not the plaintiff, by reason of taking a seat or standing on the platform in the manner testified to by him, was negligent. It is also for you to say, from all the facts in evidence, whether or not the defendant was negligent in allowing the car to be overcrowded and whether or not the car, just prior to and at the time of the accident, was running at an excessive speed, and whether or not the car was being operated by experienced or inexperienced men, and whether or not the appliances were proper and adequate with which the car or cars were being run."

The court in the 4th paragraph of his instructions defines ordinary care, and in the 5th paragraph defines negligence, and in the 6th paragraph defines contributory negligence, and in paragraph 20 the court instructed the jury as follows:

"You are instructed that in arriving at your verdict in this case, you will not single out any particular instruction or paragraph of any instructions given you herein, but you will consider the instructions as a whole and in their entirety and consider each instruction in connection with all the others given in this case, and so apply such instructions in their entirety to the evidence before you, and in so doing endeavor to arrive at a just and true verdict under all the instructions and all the evidence in the case, and return such verdict into court."

We have carefully examined the instructions of the court as a whole, and, as we have heretofore said, find the same quite free from error, and in those not set out in the opinion, as well as in those that are set out, the court stated in each instance the law applicable in apt terms, insomuch that

we think the jury were quite able to understand the instructions, and we think it clear, when paragraphs 12 and 13 are considered together, that the jury could not have failed to understand that the question of contributory negligence of the plaintiff was a question of fact to be determined by the jury, as was plainly expressed in the first part of paragraph 13, wherein the court said:

"You are instructed that it is for you to determine in this case, from all the surrounding facts and circumstances in evidence, whether or not the plaintiff, by reason of taking a seat or standing on the platform in the manner testified to by him, was negligent"

—and also understood clearly that such contributory negligence was not a question of law for the court, when the jury was plainly told by the court in paragraph 12, wherein the court said:

"You are instructed that it was not contributory negligence, as a matter of law, for him to occupy a place or be seated upon the platform when the cars were full."

Counsel for defendant contend in their 4th assignment of error that the damages awarded to the defendant were excessive, and that the verdict of the jury was rendered under passion and prejudice, as was shown by their conduct during the trial and by the evidence incorporated in the motion for new trial.

As was said by this court in the case of Dickinson, Rec., v. Whitaker, 75 Okla. 243, 182 Pac. 901, in paragraph 4 of the syllabus, as follows:

"It would be impossible to recount all the factors which enter into the common and general notions of what is fair and just as a basis to measure the damages for personal injuries. There can be no absolute standard to measure such damages, and a wide latitude of discretion is necessarily left to the good sense and discretion of the jury which fixes the award. And, in an action for personal injury, a verdict will not be set aside for excessive damages unless it clearly appears that the jury committed some gross and palpable error or acted under some improper bias, influence, or prejudice, or has totally mistaken the rules of law by which damages are regulated."

Such was the rule announced by the Supreme Court of Kansas in the case of Truman v. K. C., M. & O. Ry. Co. (Kan.) 161 Pac. 587, and in the case of Frisco v. Hodge, 53 Okla. 427, 157 Pac. 61. And in the case of Ferris v. Shandy, 71 Oklahoma, 174 Pac. 1061, this court, speaking through Mr. Justice Hardy, said:

"The rule for determining whether damages awarded are excessive, is that they must be so large as to strike mankind at first blush as being beyond all measure unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, and corruption. In short, damages must be flagrantly outrageous and extravagant, for the court cannot draw the line, having no standard by which to ascertain the excess"—citing Ry. Co. v. De Vore, 43 Okla. 534, 143 Pac. 864.

Tested by the foregoing rule, we cannot say that under the evidence in this case, where a 16-year-old boy suffered injuries that so greatly impaired his health permanently that he was never thereafter able to attend school and pursue his studies, and that as a result of such injuries he suffered great bodily pain, and five years thereafter, at the time of the trial, his undisputed testimony was that he continued to suffer severe headaches as a result of the injuries—we cannot say that a verdict of $3,000 compensation was so outrageously excessive as to shock all mankind. In this connection we have carefully considered the alleged misconduct of certain jurymen as shown by the record, and do not find that the same in any way probably resulted in a miscarriage of justice or deprived the defendant of any substantial statutory or constitutional right. Bunker v. Harding et al., 70 Oklahoma, 174 Pac. 749; Blasdel et al. v. Gower, 70 Oklahoma, 173 Pac. 644; Shawnee National Bank v. Pool, 66 Okla. 145, 167 Pac. 994; Chicago, R. I. & P. Ry. Co. v. Pruitt. 67 Oklahoma, 170 Pac. 1143; McCoy v. Wosika, 75 Okla. 3, 180 Pac. 967.

The judgment of the trial court is affirmed.

HARRISON, C. J., and KANE, MILLER, and KENNAMER, JJ., concur.